FOTI *v.* IMMIGRATION AND NATURALIZATION
SERVICE.

No. 28.   Argued October 17, 21, 1963.—Decided December 16, 1963.

*James J. Cally* argued the cause and filed a brief for
petitioner.

*Philip R. Monahan* argued the cause for respondent.
With him on the brief were *Solicitor General Cox* and
*Assistant Attorney General Miller.*

*Jack Wasserman* and *David Carliner* filed a brief for
the Association of Immigration and Nationality Lawyers,
as *amicus curiae,* urging affirmance.

MR. CHIEF JUSTICE WARREN delivered the opinion of
the Court.

Involved in this case is the single question of whether
the Federal Courts of Appeals have the initial, exclusive
jurisdiction, under § 106 (a) of the Immigration and
Nationality Act, to review discretionary determinations
of the Attorney General, relating to the suspension of
deportation, under § 244 (a)(5) of the Act.

Petitioner, a 47-year-old alien and a native and citizen
of Italy, last entered the United States in late 1950,

through the port of Norfolk, Virginia, on a seaman's visa which authorized him to remain in this country for a period not to exceed 29 days. He remained here illegally for more than 10 years, leaving his wife and three minor children in Italy. In 1961, deportation proceedings were instituted against petitioner, directing him to appear before a special inquiry officer of the Immigration and Naturalization Service and show cause why he should not be deported under § 241 (a)(2) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1251 (a)(2), as an alien who had unlawfully overstayed the period for which he had been admitted. At a hearing conducted before a special inquiry officer under § 242 (b) of the Act, petitioner conceded his deportability, and applied, in the alternative, for two forms of discretionary relief which the Attorney General is authorized by the Act to grant to deportable persons who meet defined eligibility requirements. He sought, pursuant to § 244 (a)(5) of the Act, a suspension of deportation on the ground that it would be difficult for him to earn a living for his family in Italy if he were deported and deportation would result in his having to liquidate the bakery business which he owned and operated in Brooklyn, New York. Alternatively, if suspension of deportation were refused, petitioner requested, pursuant to § 244 (e) of the Act, the privilege of voluntary departure at his own expense in lieu of deportation. The special inquiry officer, although finding that petitioner met the good moral character and 10 years' continuous presence in the United States requirements of § 244 (a)(5), denied his application for suspension of deportation, on the ground that petitioner was ineligible for that form of discretionary relief since his deportation would not result "in exceptional and extremely unusual hardship . . . ." Petitioner's alternative request for the privilege of voluntary departure was

granted, however.[1]  Petitioner appealed to the Board of Immigration Appeals from that part of the order of the special inquiry officer which denied his request for suspension of deportation.  The Board, on November 28, 1961, dismissed the appeal.  Petitioner was directed to effect his departure by December 18, 1961.  Prior to that date, petitioner commenced an action in the Federal District Court for the Southern District of New York, seeking declaratory and injunctive relief from the administrative refusal to grant his request for suspension of deportation.  The District Court dismissed the action on the ground that, under the recently enacted § 106 (a) of the Immigration and Nationality Act, 8 U. S. C. § 1105a (a),[2] the sole and exclusive procedure for obtaining judicial review of such a determination was by a petition for review filed in an appropriate Federal Court of Appeals.  Accordingly, petitioner then sought review in the Court of Appeals for the Second Circuit.  On September 21, 1962, the Court of Appeals, sitting *en banc* and by a five-to-four vote, dismissed the petition for lack of jurisdiction, holding that the term "final orders of deportation" in § 106 (a) does not include a denial of discretionary relief under § 244 (a)(5).  308 F. 2d 779.  Because of a conflict among the Courts of Appeals regarding the interpretation of this jurisdictional language in

---

[1] The granting of voluntary departure relief does not result in the alien's not being subject to an outstanding final order of deportation. In this case, the order granting voluntary departure was combined with a contingent deportation order, which directed that petitioner be deported if he failed to depart within the prescribed time and was to become effective automatically if petitioner did not depart the country by the date fixed by the District Director.

[2] Immigration and Nationality Act, § 106, as added by § 5 (a) of Public Law 87–301, approved September 26, 1961, 75 Stat. 651, 8 U. S. C. (Supp. IV, 1962) § 1105a.

§ 106 (a),[3] we granted certiorari, limited to the question whether Courts of Appeals have jurisdiction to review final administrative orders with respect to discretionary relief sought during deportation proceedings. 371 U. S. 947.

The issue involved here is solely one relating to procedures incident to deportation proceedings. In the present posture of the case, we need not be concerned with the ultimate merits as to petitioner's deportability,[4] since he concedes that he is deportable and the question of the propriety of the administrative refusal of suspension of deportation has not as yet been reviewed in any lower

---

[3] Compare *Fong* v. *Immigration and Naturalization Service*, 308 F. 2d 191 (C. A. 9th Cir. 1962), *Blagaic* v. *Flagg*, 304 F. 2d 623 (C. A. 7th Cir. 1962), and *Roumeliotis* v. *Immigration and Naturalization Service*, 304 F. 2d 453 (C. A. 7th Cir. 1962), cert. denied, 371 U. S. 921, with *Holz* v. *Immigration and Naturalization Service*, 309 F. 2d 452 (C. A. 9th Cir. 1962), *Zupicich* v. *Esperdy*, 207 F. Supp. 574 (D. C. S. D. N. Y. 1962), and the decision below.

[4] On October 24, 1962, subsequent to the decision below and while the case was pending before this Court on petition for certiorari, Congress enacted Public Law 87–885, § 4, 76 Stat. 1247, effective the same date. This enactment provides, in relevant part, for the amendment of § 244 of the Act, the source of the Attorney General's power to suspend the deportation of eligible classes of aliens, by the addition of a new subsection, which states: "(f) No provision of this section shall be applicable to an alien who (1) entered the United States as a crewman . . . ." Although petitioner concededly entered the United States as a crewman, and the Government has indicated that, when the merits of this case are reached, it will argue that petitioner is now absolutely ineligible for the relief sought, because of the 1962 amendment to § 244, we agree with the parties that the enactment of this amendment did not necessarily have the effect of rendering moot the jurisdictional issue involved in this litigation. The applicability of this provision to one in petitioner's situation is an arguable matter, and, since it is not undisputed but remains debatable whether the relief sought by petitioner could still be granted, we have determined it not improper to consider and decide the threshold question of the jurisdiction of the Court of Appeals.

federal court. The only question presented for decision involves the scope of judicial review by the Courts of Appeals of administrative determinations made during the course of deportation proceedings. Specifically, we must decide a rather narrow question of statutory construction—whether a refusal by the Attorney General to grant a suspension of deportation is one of those "final orders of deportation" of which direct review by Courts of Appeals is authorized under § 106 (a) of the Act. Both parties have contended that it is. While the question is not free of difficulty, as evidenced by the division in the court below and the conflict among the various Courts of Appeals on the matter, we have concluded that the court below erred in holding that it was not.

The statutory provision in question, § 106 (a) of the Immigration and Nationality Act, provides that the procedure for judicial review by the Courts of Appeals of certain orders [5] of the Federal Communications Commission, Secretary of Agriculture, Federal Maritime Board and Atomic Energy Commission shall also "apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 242 (b) of this Act or comparable provisions of any prior Act . . . ." Section 242 provides a detailed administrative procedure for determining whether an alien should be deported. Sections 243 and 244 relate to certain situations in which the Attorney General may suspend deportation in his discretion. In its decision below, the Court of Appeals for the Second Circuit held that § 106 (a) applies only to orders required by statute to be made in a § 242 (b) hearing, i. e., findings of de-

---

[5] Hobbs Act, 64 Stat. 1129 (1950), as amended, 5 U. S. C. § 1031–1042, vesting the Courts of Appeals with exclusive jurisdiction to review final orders of certain designated federal agencies.

portability. Both petitioner and the Government have urged that the decision below should be reversed, and that the statutory language should be so construed as to include both an adjudication of deportability and an order denying suspension of deportation. Based on the historical background of the Immigration and Nationality Act,[6] the manifest purpose of Congress in enacting § 106 (a), the context of the statutory language when viewed against the prevailing administrative practices and procedures, and pertinent legislative history of § 106 (a), we are led to the conclusion that the interpretation argued for by petitioner and the Government is the correct one.

Prior to 1940, the Attorney General had no discretion with respect to the deportation of an alien who came within the defined category of deportable persons. The expulsion of such a person was mandatory; his only avenue of relief in a hardship case was by a private bill in Congress. Therefore, any differentiation that might have been made prior to 1940 between a determination that an alien was deportable and the order directing his deportation would have been merely formalistic and essentially meaningless. In fact, the determination of deportability necessarily resulted in, and was invariably accompanied by, a deportation order. Since 1940, however, when the Attorney General was given the power to grant discretionary relief under various circumstances in deportation cases,[7] administrative regulations having the force and effect of law have provided for the practice of determining deportability and ruling on an application

---

[6] On the history of the recent congressional enactments relating to deportation, see Comment, 71 Yale L. J. 760 (1962).

[7] Regarding the extent of the Attorney General's discretion in suspension of deportation cases, see, e. g., Jay v. Boyd, 351 U. S. 345, 354, 357–358 (1956).

for suspension of deportation in a single proceeding conducted by the Immigration and Naturalization Service. Thus, the administrative discretion to grant a suspension of deportation has historically been consistently exercised as an integral part of the proceedings which have led to the issuance of a final deportation order, and discretionary relief, if sought, must be requested prior to or during the deportation hearing. The hearings on deportability and on an application for discretionary relief have, as a matter of traditional uniform practice, been held in one proceeding before the same special inquiry officer, resulting in one final order of deportation. Significantly, when suspension is granted, no deportation order is rendered at all, even if the alien is in fact found to be deportable.

It must be concluded that Congress knew of this familiar administrative practice and had it in mind when it enacted § 106 (a). These usages and procedures, which were actually followed when the provision was enacted, must reasonably be regarded as composing the context of the legislation. A colloquy between Congressmen Walter, Lindsay and Moore, all knowledgeable in deportation matters,[8] is definitely corroborative of this view. This colloquy occurred during the House debates on the predecessor to the bill which was enacted in 1961 and contained § 106 (a).[9] Representative Lindsay suggested that the

---

[8] Representative Walter was the chairman of a subcommittee of the House Judiciary Committee responsible for immigration and nationality matters, author and chief sponsor of the measure under consideration, and a respected congressional leader in the whole area of immigration law. Representative Lindsay was thoroughly familiar with the problems in this area and the role of discretionary determinations denying suspension in the deportation process, as a result of having represented the Government, three years earlier, in *Jay* v. *Boyd*, 351 U. S. 345 (1956). Representative Moore was a co-sponsor of the bill under discussion and a member of the House Judiciary Committee out of which the bill containing § 106 (a) was reported.

[9] 105 Cong. Rec. 12728.

legislative history should make absolutely clear "that if there is any remedy on the administrative level left of any nature, that the deportation order will not be considered final." Representative Walter agreed, and stated that "the final order means the final administrative order." With Representative Moore concurring, all three congressmen agreed that there would be no "final order of deportation" until after determination of the question of suspension. Significantly, Representative Walter, in discussing the running of the time period provided for the filing of petitions for review by the Courts of Appeals under the proposed legislation, stated that "the 6 months' period on the question of finality of an order applies to the final administrative adjudication of the applications for suspension of deportation just as it would apply to any other issue brought up in deportation proceedings." With the dissenters below, we feel that the court's speculation that few congressmen were present at the time of this exchange was unwarranted and probably immaterial.

It can hardly be contended that the meaning of the phrase "final orders of deportation" is so clear and unambiguous as to be susceptible of only a narrow interpretation confined solely to determinations of deportability. If anything, the literal language would appear to include a denial of discretionary relief, made during the same proceedings in which deportability is determined, which effectively terminates the proceeding. In arriving at the intended construction of this language, we must therefore inevitably turn to the purpose of Congress in enacting this legislation. The fundamental purpose behind § 106 (a) was to abbreviate the process of judicial review of deportation orders in order to frustrate certain practices which had come to the attention of Congress, whereby persons subject to deportation were forestalling departure by dilatory tactics in the courts. A House Judiciary Committee report succinctly stated the problem

to which Congress addressed itself in enacting § 106 (a).[10] It indicated that the Committee "has been disturbed in recent years to observe the growing frequency of judicial actions being instituted by undesirable aliens whose cases have no legal basis or merit, but which are brought solely for the purpose of preventing or delaying indefinitely their deportation from this country." Pointing to the essence of the problem, the report continued:

> "Other aliens, mostly subversives, gangsters, immoral [persons], or narcotic peddlers, manage to protract their stay here indefinitely only because their ill-gotten gains permit them to procure the services of astute attorneys who know how to skillfully exploit the judicial process. Without any reflection upon the courts, it is undoubtedly now the fact that such tactics can prevent enforcement of the deportation provisions of the Immigration and Nationality Act by repetitive appeals to the busy and overworked courts with frivolous claims of impropriety in the deportation proceedings."

The key feature of the congressional plan directed at this problem was the elimination of the previous initial step in obtaining judicial review—a suit in a District Court— and the resulting restriction of review to Courts of Appeals, subject only to the certiorari jurisdiction of this Court. As stated in the same Committee report, the plain objective of § 106 (a) was "to create a single, separate, statutory form of judicial review of administrative orders for the deportation . . . of aliens . . . ." [11] Fur-

---

[10] H. R. Rep. No. 1086, 87th Cong., 1st Sess. 22–23 (1961).

[11] In further elucidating the purpose of the proposed legislation on the floor of the House, Representative Walter, in reference to one of the predecessor bills in 1958, stated: "Most important, by eliminating review in the district courts, the bill would obviate one of the primary causes of delay in the final determination of all questions which may arise in a deportation proceeding." 104 Cong. Rec. 17173.

ther evidence of a specific congressional intent to give Courts of Appeals exclusive jurisdiction to review denials of discretionary relief in deportation proceedings is contained in the legislative history. Case histories of abuse of the existing judicial review process, as summarized in the various Committee reports, include references to litigation arising out of discretionary determinations. And a reference chart reproduced in the Committee reports shows the denial of discretionary relief as being antecedent to and a constituent part of the "final order of deportation." Although deportability and whether to grant a suspension are determined in the same hearing, the decision below means that an alien may appeal only the deportability finding to a Court of Appeals and must initially seek review of a denial of suspension in a District Court. A short analysis of the reasoning of the court below demonstrates that its conclusion is inconsistent with this manifest purpose of Congress.

Although the Court of Appeals agrees that the basic purpose of § 106 (a) was to expedite the deportation of undesirable aliens by preventing successive dilatory appeals to various federal courts, it fails to apply that interpretation to the question presented in this case. Its finding that the bifurcated procedure resulting from an alien's seeking review of a denial of discretionary relief in a District Court and review of an adjudication of deportability, as is admittedly required by § 106 (a), in a Court of Appeals would expedite the deportation is without foundation. It is premised on its assumption that, in actions to review denial of discretionary relief, District Courts rarely grant restraining orders. Reliance upon such an assumption, we feel, is unjustified.[12] At all events, under the

---

[12] According to the General Counsel of the Immigration and Naturalization Service, the Service's policy and practice is to stay deportation, *sua sponte,* when a petition to obtain judicial review of deter-

procedure urged by the petitioner and the Government, an alien can obtain an automatic stay of deportation under § 106 (a) by seeking a review of the finding of deportability and can simultaneously seek review of the denial of discretionary relief in a Court of Appeals. Review of the denial of discretionary relief is ancillary to the deportability issue, and both determinations should therefore be made by the same court at the same time. We realize that deportability is conceded in a large number of cases.[13] But this fact hardly detracts from our view as to a proper interpretation of § 106 (a).[14]

In substance, we feel that the Court of Appeals was wrong in limiting the phrase "final orders of deportation"

---

minations made during the administrative proceedings is not "patently frivolous." See Comment, 111 U. of Pa. L. Rev. 1226, 1230 (1963). Consequently, temporary restraining orders issued by District Courts would usually be unnecessary to prevent deportation, and whether District Courts grant restraining orders rarely or frequently is rather irrelevant. And the assumption of the court below that, since the Attorney General can moot the proceedings in the District Courts (unless a restraining order is issued) by deporting the alien *pendente lite,* ultimate deportation would be expedited by permitting bifurcated judicial review seems unwarranted. Also, an assumption that the practice of District Courts is merely to issue restraining orders pending final disposition in a Court of Appeals of all of the questions presented for judicial review in a deportation case appears unjustified. See, *e. g., Zupicich* v. *Esperdy,* 207 F. Supp. 574 (D. C. S. D. N. Y. 1962).

[13] Deportability is conceded in about 80% of the cases. See Gordon and Rosenfield, Immigration Law and Procedure, § 5.7a, at 541 (1962). Even so, the bifurcation problem remains in that type of case which prompted the enactment of § 106 (a), where judicial review of both an adjudication of deportability and a denial of discretionary relief is sought.

[14] Because of the effect of our holding here, it is of course unnecessary to consider the Government's contention that, where deportability is actually adjudicated, a Court of Appeals has "pendent jurisdiction" to review a denial of discretionary relief in the same proceeding.

in § 106 (a) to adjudications of deportability. The finding of the court below that the phrase was a "term of art" with a well-understood meaning, merely because it was used several times in §§ 242 and 244 when plainly referring only to rulings on deportability, cannot be substantiated. Section 106 (a) was of course not enacted contemporaneously with §§ 242 and 244, and it is solely concerned with the rather different problem of judicial review. And the language of § 242 (b) indicates that Congress plainly distinguished determinations of deportability from orders of deportation. We regard this as of especial relevance since § 106 (a), in describing the "final orders of deportation" intended to be encompassed thereunder, specifically refers to administrative proceedings conducted under § 242 (b).

Paragraph (4) of the subsidiary exceptions to § 106 (a) provides for review solely upon the administrative record and indicates that the findings of fact below are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." However, this does not necessarily mean that Congress intended review in the Courts of Appeals to be restricted to adjudications of deportability. Admittedly, the standard of review applicable to denials of discretionary relief cannot be the same as that for adjudications of deportability, since judicial review of the former is concededly limited to determinations of whether there has been any abuse of administrative discretion. While paragraph (4) clearly applies only to review of adjudications of deportability, and possibly to review of administrative findings of eligibility for discretionary relief,[15] this is not decisive with respect to

---

[15] In the instant case the special inquiry officer not only found that petitioner failed to meet the eligibility requirements for suspension of deportation, since no hardship would result from his deportation, but further indicated that, even had the hardship requirement been met,

the intent of Congress. The inclusion in one of the "exceptions" to the principal provision of § 106 (a) of a proviso which primarily could apply only to determinations of deportability does not necessarily indicate that the principal provision of the section was also intended to be thus limited. Since the adjudication of deportability is certainly the principal ingredient, and an indispensable one, of the ultimate result of the proceeding—a final order of deportation—it would not be unusual for Congress to include in an overall enactment relating to judicial review of all final orders of deportation a specific provision pertinent to the primary constituent of such an order.

Also, it seems rather clear that all determinations made during and incident to the administrative proceeding conducted by a special inquiry officer, and reviewable together by the Board of Immigration Appeals, such as orders denying voluntary departure pursuant to § 244 (e) and orders denying the withholding of deportation under § 243 (h), are likewise included within the ambit of the exclusive jurisdiction of the Courts of Appeals under § 106 (a). We see nothing anomalous about the fact that a change in the administrative regulations may effectively broaden or narrow the scope of review available in the

relief would have been denied as a discretionary matter. Since a special inquiry officer cannot exercise his discretion to suspend deportation until he finds the alien statutorily eligible for suspension, a finding of eligibility and an exercise of (or refusal to exercise) discretion may properly be considered as distinct and separate matters. And since the finding of eligibility involves questions of fact and law, paragraph (4) of § 106 (a) might be read to require that this finding be based on substantial evidence in the record. See Comment, 111 U. of Pa. L. Rev. 1226, 1229 (1963). However, we need not pass on this question here. And, of course, denial of suspension of deportation as a discretionary matter is reviewable only for arbitrariness and abuse of discretion, and thus could hardly be within the procedural and evidentiary requisites of paragraph (4).

Courts of Appeals.[16]   Furthermore, we do not regard it "in the last degree unlikely" that Congress intended a court of three judges to initially review discretionary determinations denying suspension of deportation.  Much of the litigation in deportation cases with respect to the setting aside of an administrative determination on the ground of arbitrariness involves disputed eligibility questions and matters of statutory construction.   Additionally, the concern of the court below does not comport with the declared purpose of § 106 (a) to eliminate the District Court stage of the judicial review process in an effort to prevent dilatory tactics.   And the suggestion of the court below that it is "incredible" that Congress meant to burden the Courts of Appeals with review of all orders denying discretionary relief in deportation cases is uncon-

---

[16] When § 106 (a) was enacted, the withholding of deportation under § 243 (h) was a matter determined by an official other than the special inquiry officer conducting the deportation hearing, on a later occasion, under regulations promulgated by the Attorney General, and the designation of the country of deportation was not made until after the issuance of the warrant of deportation.   Under revised and currently effective regulations, both the designation of the country of deportation and the decision on any § 243 (h) request for relief which the alien might wish to make are effected in the deportation proceedings and reflected in the final order of deportation.   While presumably denials of § 243 (h) relief were not covered by § 106 (a) at the time of its enactment, it does not seem incongruous to assume that such orders, because of the change in administrative regulations making such decisions an integral part of the deportation proceedings conducted by a special inquiry officer, are now within the reach of § 106 (a)'s judicial review provisions.   Such a result simply means that, while the jurisdiction of the Courts of Appeals is limited now, as when § 106 (a) was enacted, to the review of "all final orders of deportation," a change in the administrative regulations relating to the processing and determination of applications for § 243 (h) relief had the incidental effect of expanding the decisional content of such orders.   Clearly, changes in administrative procedures may affect the scope and content of various types of agency orders and thus the subject matter embraced in a judicial proceeding to review such orders.

vincing. Congress presumably realized that, in practical effect, those engaged in dilatory tactics would hardly hesitate to appeal to a Court of Appeals from an adverse District Court determination where discretionary relief had been denied in the administrative proceeding.[17]

We need not pass at this time on whether § 106 (a) extends the exclusive jurisdiction of the Courts of Appeals to include review of orders refusing to reopen deportation proceedings.[18] The question is admittedly a somewhat different one, since such an administrative determination is not made during the same proceeding where deportability is determined and discretionary relief is denied. And, of course, our decision in this case in no way impairs the preservation and availability of habeas corpus relief.[19]

---

[17] Compare, however, 308 F. 2d, at 785, n. 6, where the court below referred to the "inarticulate premise that all deportation suits are appealed . . ." from District Courts to Courts of Appeals.

[18] The court below manifested its concern that, if it were to find that it had jurisdiction in this case, the door would then be opened to the obtaining of review of a refusal to reopen a deportation proceeding in the Courts of Appeals. 308 F. 2d, at 785. And the Government has argued in its brief that, although the question is a close one, an order refusing to reopen a deportation proceeding should be regarded as within the provisions of § 106 (a) with respect to judicial review in the Courts of Appeals, though occurring subsequent to the issuance of a final deportation order. Brief for respondent, pp. 51–54. Compare *Giova* v. *Rosenberg,* 308 F. 2d 347 (C. A. 9th Cir. 1962), petition for cert. pending, No. 15, Misc., October Term, 1963. Cf. *Dentico* v. *Immigration and Naturalization Service,* 303 F. 2d 137 (C. A. 2d Cir. 1962), holding that Courts of Appeals have exclusive jurisdiction to review denials of motions to reopen deportation proceedings, where review of a final order of deportation is sought at the same time.

[19] Compare the provisions of § 106 (c) purporting to restrict the availability of habeas corpus relief in deportation cases. But see the provisions of § 106 (a) (9) with respect to the availability of habeas corpus relief to aliens held in custody pursuant to a deportation order.

We believe that the controlling intention of Congress, in enacting § 106 (a), was to prevent delays in the deportation process by vesting in the Courts of Appeals sole jurisdiction to review "all final orders of deportation." It seems apparent that, because of the consistent practice under the administrative regulations since 1940 of adjudicating deportability and passing on applications for discretionary relief in the same proceeding, the final administrative action that Congress was thinking of in using the phrase "final orders of deportation" included denials of suspension of deportation. To so construe § 106 (a) does not constitute an expansion of "the words used by Congress beyond their well-understood meaning." Bifurcation of judicial review of deportation proceedings is not only inconvenient; it is clearly undesirable and not the necessary result from a fair interpretation of the pertinent statutory language. Therefore, this matter can and should be passed upon by the Courts of Appeals, resulting in a judicial review procedure that would be both fair to the petitioner and expeditious for the Government. The decision below is therefore reversed and the case is remanded to the Court of Appeals for further consideration consistent with this opinion.        *It is so ordered.*

Mr. Justice Harlan, concurring.

Believing that a jurisdictional statute of this kind should be circumspectly construed, cf. *Kesler* v. *Department of Public Safety,* 369 U. S. 153, 156–157, and recognizing the force of the considerations which concerned the majority of the Court of Appeals, 308 F. 2d 779, I am nevertheless satisfied that the legislative history of § 106 (a) of the Immigration and Nationality Act leaves no room for a conclusion other than that which this Court has reached.

I therefore concur in the judgment.