

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-1996

# Massieu v. Atty Gen United States

Precedential or Non-Precedential:

Docket 96-5125

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Massieu v. Atty Gen United States" (1996). *1996 Decisions.* Paper 129.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/129

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 96-5125
_____

MARIO RUIZ MASSIEU

v.

JANET RENO, In Her Capacity as Attorney General
of the United States of America; WARREN CHRISTOPHER,
In His Capacity as Secretary of State of the
United States; UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE; WARREN A. LEWIS, In His
Capacity as District Director of the Immigration
and Naturalization Service; DEMETRIUS GEORGAKOPOULOS,
In His Capacity as Assistant District Director,
Investigations, Immigration and Naturalization Service,
Appellants
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 96-00104)
_____

Argued:  May 10, 1996
Before:  GREENBERG, ALITO, and McKEE, Circuit Judges:
(Opinion Filed:  July 29, 1996)
_____

Frank W. Hunger
Assistant Attorney General
Gary G. Grindler
Stephen W. Preston
Deputy Assistant Attorneys General
Douglas N. Letter
Jacob M. Lewis (Argued)
David J. Kline
Attorneys, Civil Division
Department of Justice, Room 3617
9th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530


Attorneys for Appellants

Cathy Fleming, Esq. (Argued)
Camille M. Kenny, Esq.
Fleming, Roth & Fettweis
744 Broad Street, Suite 701
Newark, New Jersey 07102

Attorney for Appellee

_____

OPINION OF THE COURT

_____


ALITO, Circuit Judge:


This is an appeal from an order of the district court declaring unconstitutional  241(a)(4)(C)(i) of the Immigration and Nationality Act (the "INA" or the "Act"), 8 U.S.C. 1251(a)(4)(C)(i), and enjoining further deportation proceedings against plaintiff under that provision.  Entertaining jurisdiction over plaintiff's constitutional claims under 28 U.S.C.  1331, the district court held that  241(a)(4)(C)(i) violates the Due Process Clause because it is impermissibly vague and deprives aliens such as plaintiff of a meaningful opportunity to be heard.  In addition, the court held that  241(a)(4)(C)(i) represents an unconstitutional delegation of legislative power.

We do not reach the merits of the constitutional questions decided by the district court.  Instead, we hold that the district lacked jurisdiction to entertain plaintiff's claims. Under  106 of the INA, 8 U.S.C.  1105a, if plaintiff wished to challenge the efforts to deport him, he was required to exhaust available administrative remedies and then petition for review in this court.  Accordingly, we reverse the district court's order, and we remand to the district court with an instruction to dismiss plaintiff's complaint.

I.

A.  The relevant allegations of plaintiff's complaint, which were set forth in detail by the district court, see Massieu v. Reno, 915 F. Supp. 681 (D.N.J. 1996), may be summarized as follows.  Plaintiff Mario Ruiz Massieu ("plaintiff" or "Ruiz Massieu") is a citizen of Mexico who has spent most of his adult life working as an academic or government official.  From 1990 until 1993, he was Mexico's Ambassador to Denmark; for part of 1993, he served as the Deputy Attorney General; in 1994, he was the Undersecretary for the Department of Government; and from May until November of 1994, he again held the position of Deputy Attorney General.

Plaintiff's brother, Jose Francisco Ruiz Massieu, was the Secretary General of the governing Institutional Revolutionary Party.  In September 1994, plaintiff's brother was assassinated in Mexico City.  Plaintiff, as the Deputy Attorney General, requested permission from President Salinas and President-elect Zedillo to allow his office to lead the investigation into his brother's death.

Plaintiff led the investigation for approximately two months before resigning both his position as Deputy Attorney General and his membership in the Institutional Revolutionary

Party.  In a November 1994 speech, plaintiff announced his resignations and attributed them to efforts by the party to block the investigation into his brother's death.  The speech and other criticisms of the government were published in February 1995 in plaintiff's book, I Accuse: Denunciation of a Political Crime.

On March 2, 1995, Mexican authorities interrogated plaintiff concerning criminal activities allegedly committed while he was in office.  Later that day, plaintiff and his family entered the United States in Houston, Texas.  Plaintiff was granted a six-month non-immigrant visitor visa.  He and his family stayed overnight at plaintiff's Houston home, which he has owned since October 1994.  The next day, plaintiff travelled to Newark en route to Spain.  He was arrested in Newark by United States Customs officials and charged with failing to report all currency in his possession in violation of 31 U.S.C.  5316.  Specifically, plaintiff was charged with failing to report about $26,000 of the roughly $44,000 in cash that he was carrying with him.  A few days later, the Mexican government charged plaintiff with several violations of Mexican criminal law.

Over the next nine months, the United States government brought four extradition proceedings seeking plaintiff's extradition to Mexico.  These were filed in March, June, August, and October 1995, and they sought extradition on charges of obstruction of justice and embezzlement.  However, two United States Magistrate Judges, sitting as extradition judges under 18 U.S.C.  3184 and Rule 40.B.12 of the General Rules for the District of New Jersey, concluded that there was insufficient evidence to support a finding of probable cause to believe that plaintiff had committed the crimes for which his extradition was sought.  The extradition complaints were therefore dismissed.

The final extradition complaint was dismissed on December 22, 1995.  On the same day, the government instituted a deportation proceeding against plaintiff through the service of an order to show cause and notice of hearing.  The government alleged that plaintiff was subject to deportation under 8 U.S.C.  1251(a)(4)(C)(i), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."  On December 27, 1995, plaintiff moved for bail pending completion of the deportation proceeding.  After briefing, the immigration judge denied bail on January 11, 1996.  The first stage of the deportation proceeding was scheduled to begin on January 19, 1996.

B.  On January 17, 1996, however, plaintiff sought to enjoin the deportation proceeding by filing a complaint in the United States District Court for the District of New Jersey.  Named as defendants were Janet Reno, Attorney General of the United States; Warren Christopher, Secretary of State of the United States; the United States Immigration and Naturalization Service ("the Service"); Warren A. Lewis, District Director of the Service; and Demetrius Georgakopoulos, Assistant District Director of the Service.  Plaintiff's complaint sought to enjoin the deportation proceeding on three grounds:  (1) "illegal de

facto extradition," App. 19-22; (2) "selective enforcement," App. 22-24; and (3) the "unconstitutionality of 8 U.S.C. 1251(a)(4)(C)," App. 24-25. On January 19, 1996, and January 24, 1996, the district court granted plaintiff's applications for temporary restraints and a preliminary injunction, essentially staying the deportation proceeding pending consideration of plaintiff's request for a permanent injunction.

On February 28, 1996, the district court issued an order declaring 241(a)(4)(C)(i) unconstitutional on three separate grounds. First, the court held that the provision is void for vagueness because it does not provide adequate notice to aliens of the standards with which they must conform and does not furnish adequate guidelines for law enforcement. Second, the court held that 241(a)(4)(C)(i) violates procedural due process; the court reasoned that the provision deprives an alien of a meaningful opportunity to be heard since the Secretary of State's determination that he falls within the statutory standard is allegedly unreviewable. Finally, the court held that 241(a)(4)(C)(i) represents an unconstitutional delegation of legislative power because it lacks "sufficiently intelligible standards to direct the Secretary's exercise of discretion and to enable the court to review the exercise thereof." 915 F. Supp. at 707. The court thus entered an order declaring the provision unconstitutional and enjoining deportation proceedings against plaintiff based on that provision. The court also ordered that plaintiff be discharged from custody, but the court stayed its order until March 1, 1996.

Defendants appealed to this court and requested a stay pending appeal. On March 1, 1996, we granted defendants' motion for a temporary stay, and on March 5, 1996, we granted plaintiff bail with conditions pending appeal. We then granted expedited review, and we now reverse.

II.

The defendants in this case contend that the district court lacked jurisdiction to entertain plaintiff's constitutional claims. According to the defendants, if the plaintiff wished to contest his deportation, he was required to exhaust the administrative remedies available under the INA and then petition for review in this court.

A. 1. In assessing this argument, our controlling concern is congressional intent. See, e.g., Patsy v. Florida Bd. of Regents, 457 U.S. 496, 501-02 & n.4 (1982) ("[L]egislative purpose . . . is of paramount importance in the exhaustion context because Congress is vested with the power to prescribe the basic procedural scheme under which claims may be heard in federal courts. . . . [T]he initial question whether exhaustion is required should be answered by reference to congressional intent."). If Congress intended to delay federal court review of claims by aliens against whom deportation proceedings have been instituted until the conclusion of the administrative proceedings, then neither the district court nor this court can override that decision. See, e.g., McCarthy v. Madigan, 503 U.S. 140, 144 (1992) (Bivens claim) ("Of `paramount importance' to any exhaustion inquiry is congressional intent. Where Congress

specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs.") (citations omitted); Giammario v. Hurney, 311 F.2d 285, 287–88 (3d Cir. 1962) ("The recent amendment providing for exclusive review of final orders of deportation in the courts of appeals of the United States, 8 U.S.C.A. 1105a(a), is challenged in petitioner's brief as violating his constitutional rights[.]  [W]e see no merit to [this argument]. It is well settled that Congress may provide whatever procedure that it deems appropriate for judicial review of administrative orders.") (citation omitted); see also McCarthy v. Madigan, 503 U.S. at 152 ("Because Congress has not required exhaustion of a federal prisoner's Bivens claim, we turn to an evaluation of the individual and institutional interests at stake in this case.") (emphasis in original); Coit Independence Joint Venture v. FSLIC, 489 U.S. 561, 579–80 (1989); Patsy v. Florida Bd. of Regents, 457 U.S. at 502 n.4 ("Of course, exhaustion is required where Congress provides that certain administrative remedies shall be exclusive.") (citing Meyers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 (1938)); Commonwealth of Virginia v. United States, 74 F.3d 517, 523 (4th Cir. 1996) ("It is settled that `when Congress has chosen to provide the circuit courts with exclusive jurisdiction over appeals from agency [actions], the district courts are without jurisdiction over the legal issues pertaining to final [actions].") (alterations in Commonwealth) (citation omitted); Maxon Marine v. Director, OWCP, 39 F.3d 144, 146 (7th Cir. 1994) ("When a statute specifies a procedure for obtaining judicial review of a federal agency's actions, that procedure normally is exclusive.") (citations omitted); see generallySaulsbury Orchards & Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1194 (9th Cir. 1990) (Agricultural Marketing Agreement Act) ("We are also mindful of the fact that the exhaustion requirement in this case is statutorily provided and not judicially created. Although judicially developed exhaustion requirements might be waived for discretionary reasons by courts, statutorily created exhaustion requirements bind the parties and the courts. `When a statute requires exhaustion, a petitioner's failure to do so deprives this court of jurisdiction.  Only if there is no statutory exhaustion requirement may we exercise our discretion to apply judicially-developed exhaustion rules.'") (quoting Reid v. Engen, 765 F.2d 1457, 1462 (9th Cir. 1985)); II Kenneth Culp Davis et al., Administrative Law Treatise  15.3 at 318 (3d ed. 1994) ("Most agency organic acts do not address exhaustion.  When they do, however, courts are not free simply to apply the common law exhaustion doctrine with its pragmatic, judicially defined exceptions.  Courts must, of course, apply the terms of the statute.").

2.  We turn then to the question whether Congress has expressed an intention to preclude an alien in plaintiff's position from initially asserting his constitutional claims in an action in district court and to require the alien instead to exhaust administrative remedies and then petition for review in the appropriate court of appeals.  Our analysis of this question is guided by the Supreme Court's decision in Thunder Basin Coal

Co. v. Reich, 114 S. Ct. 771 (1994). Thunder Basin involved a statutory-review scheme similar to that of the INA. Under the statute at issue in Thunder Basin, the Federal Mine Safety and Health Amendments Act of 1977 (the "Mine Act"), 30 U.S.C. 801 et seq., challenges to the Secretary of Labor's enforcement actions are subject to review by the Federal Mine Safety and Health Review Commission, 30 U.S.C. 815, 823, and final orders of the Commission are reviewable by means of a petition for review filed in the appropriate court of appeals. 30 U.S.C. 816. In Thunder Basin, a mine operator filed an action in district court seeking pre-enforcement injunctive relief on constitutional grounds, but the court of appeals held that the Act's scheme of enforcement and administrative review precluded district court jurisdiction over the mine operator's claims.

In reviewing this decision, the Supreme Court began by observing:

> In cases involving delayed judicial review of final agency actions, we shall find that Congress has allocated initial review to an administrative body where such intent is "fairly discernible in the statutory scheme." Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review.

114 S. Ct. at 776 (citations and footnote omitted). Applying these factors, the Court found that "the Mine Act's comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a `fairly discernible' intent to preclude district court review in the present case." 114 S. Ct. at 780-81 (citation omitted). The Court added that "[n]othing in the language and structure of the Act or its legislative history suggests that Congress intended to allow mine operators to evade the statutory-review process by enjoining the Secretary from commencing enforcement proceedings." Id. at 781.

Under the Thunder Basin test, we must consider the language of 106 of the INA, its stated purpose, its legislative history, and the overall structure of the administrative process, as well as whether plaintiff will be able to secure meaningful review of his claims after exhaustion. We find that all of these factors suggest that, whenever an alien is the subject of deportation proceedings, 106 is intended to delay judicial review until after administrative exhaustion. We thus conclude that there is a "fairly discernible" congressional intent to delay federal court review in the circumstances present in this case.

3. Under 106(c) of the INA, 8 U.S.C. 1105a(c), "an order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." Section 106(a) of the Act, 8 U.S.C. 1105a(a), further provides that, subject to statutory exceptions not

invoked here, "the sole and exclusive procedure for . . . the judicial review of all final orders of deportation" is by the filing of a petition for review in the appropriate court of appeals pursuant to the Hobbs Act, 28 U.S.C. 2342. In addition, 242(b) of the Act, 8 U.S.C. 1252(b) -- which sets forth a "specialized administrative procedure applicable to deportation proceedings," Marcello v. Bonds, 349 U.S. 302, 308 (1955) -- expressly states that "[t]he procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section." 8 U.S.C. 1252(b). Furthermore, even where an alien is attempting to prevent an exclusion or deportation proceeding from taking place in the first instance and is thus not, strictly speaking, attacking a final order of deportation or exclusion, it is well settled that "judicial review is precluded if the alien has failed to avail himself of all administrative remedies," one of which is the deportation or exclusion hearing itself. See, e.g., Xiao v. Barr, 979 F.2d 151, 153 (9th Cir. 1992); see also 3 Charles Gordon & Stanley Mailman, Immigration Law and Procedure 81.02[2], at 81-26-28 (1996) ("A person against whom a deportation proceeding is brought may feel that the proceeding is unjustified and illegal but generally has no right to go to court immediately to stop the proceeding. Congress has provided an administrative device for passing upon an alien's deportability, and generally there must be a final administrative ruling before judicial review can be initiated.").

According to the legislative history of 106, the purpose of this section is "to create a single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens from the United States, by adding a new section 106 to the Immigration and Nationality Act." H.R. Rep. No. 1086, 87th Cong., 1st Sess., reprinted in, 1961 U.S.C.C.A.N. 2950, 2966 (1961). "[T]his section would vest exclusive jurisdiction in the Federal courts of appeals to review deportation orders," id. at 2971, and, "[i]n an effort to curtail, if not to eliminate repetitious and unjustified appeals to courts for interference with the enforcement of deportation orders, the section declares that an order of deportation or of exclusion shall not be reviewed by a court if the alien has not exhausted his administrative remedies." Id. at 2971-72; see alsoFoti v. INS, 375 U.S. 217, 224-25 (1963) ("The fundamental purpose behind 106(a) was to abbreviate the process of judicial review of deportation orders in order to frustrate certain practices which had come to the attention of Congress, whereby persons subject to deportation were forestalling departure by dilatory tactics in the courts. . . . The key feature of the congressional plan directed at this problem was the elimination of the previous initial step in obtaining judicial review -- a suit in a District Court -- and the resulting restriction of review to the Courts of Appeals, subject only to the certiorari jurisdiction of this Court."); id. at 232 ("We believe that the controlling intention of Congress, in enacting 106(a), was to prevent delays in the deportation process by vesting in the Courts of Appeals sole jurisdiction to review `all final orders

of deportation.'").

The administrative regulation of deportation proceedings is detailed and comprehensive. See generally 8 U.S.C. 1251-1254; 8 C.F.R. 241-244; see also, e.g., United States v. Jalilian, 896 F.2d 447, 449 (10th Cir. 1990). But for present purposes, a broad overview will suffice.

Deportability determinations are made initially by an immigration judge after a formal hearing. See 8 U.S.C. 1252(b); 8 C.F.R. 242.16(a). If the immigration judge decides that the alien should be deported from the United States, the alien may pursue an administrative appeal to the Board of Immigration Appeals. See 8 C.F.R. 242.21. The Board's decision is administratively final unless the case is referred to the Attorney General for review. See 8 C.F.R. 3.1(d)(2), (h). Following final administrative action, the "sole and exclusive procedure" for obtaining judicial review of deportation orders is by direct review in the appropriate United States Court of Appeals. See 8 U.S.C. 1105a(a).

A court of appeals may review a final order of deportation made against an alien within the United States and "all matters on which the validity of the final order is contingent." See INS v. Chada, 462 U.S. 919, 937-39 (1983). Thus, the courts of appeals generally may provide meaningful review as to any properly exhausted claims directly attacking a final order of deportation. See id.; see generally Gottesman v. INS, 33 F.3d 383, 386-87 (4th Cir. 1994).

Based on the above, we conclude that Congress intended to delay federal court review of claims by aliens against whom deportation proceedings have been instituted until the conclusion of the administrative proceedings. Thus, plaintiff must exhaust his administrative remedies and, if he still so desires, file a petition for review in this court. By filing suit in the district court to enjoin the deportation proceeding, Ruiz Massieu, like the plaintiff in Maxon Marine, not only failed to exhaust his administrative remedies, but sought review in the wrong court. See Maxon Marine, 39 F.3d at 147. Put simply, Congress has removed jurisdiction over plaintiff's claims from the district courts and has vested exclusive federal court jurisdiction in this court after the exhaustion of available administrative remedies.

B. In Thunder Basin, the Court recognized that a statutory-review scheme such as that contained in the Mine Act does not prevent the district courts from exercising jurisdiction over claims that are not of the type intended to be reviewed under that scheme, especially if such claims could not otherwise receive meaningful judicial review. Thunder Basin, 114 S. Ct. at 779. Specifically, the Court stated:

> This Court previously has upheld district court jurisdiction over claims considered "wholly `collateral'" to a statute's review provisions and outside the agency's expertise, particularly where a finding of preclusion could foreclose all meaningful judicial review. . . . An analogous

situation is not presented here.
Id.

Plaintiff argues that this "exception" applies here, but we disagree.  First, plaintiff's constitutional challenge to the statute is not like the types of claims that courts in past cases have considered "wholly collateral" to the administrative review process.  Second, delaying plaintiff's constitutional challenge until after he exhausts his administrative remedies will in no way foreclose meaningful judicial review.

1.  Plaintiff's constitutional challenge is not collateral to the provisions governing an alien's right to administrative and judicial review of decisions made in deportation proceedings.  Our analysis of this issue is guided by McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), which was discussed in both Thunder Basin and the district court's decision in this case.

In McNary, plaintiffs filed a class action challenging the Immigration and Naturalization Service's implementation of the Special Agricultural Workers Program.  The "narrow issue" before the Court was whether a section of the Immigration and Nationality Act that barred judicial review (except in deportation proceedings) of individual agency determinations of adjustment of status applications seeking Special Agricultural Workers status also foreclosed a general challenge to alleged unconstitutional practices by the Service in processing the applications.  Id. at 491.  The Court held that the district court had jurisdiction to hear plaintiffs' claims.

In reaching this decision, the Court stressed three important points, each of which counselled in favor of district court jurisdiction in that case and each of which counsels against district court jurisdiction here.  First, the Court concluded that the plaintiffs' claims did not fall within the language of the provision of the statute that was said to preclude district court jurisdiction.  The Court noted that the relevant statutory language referred to "the process of direct review of individual denials" of Special Agricultural Workers status and did not address "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications."  Id. at 492.  Second, the Court emphasized that the plaintiffs' challenge did not go to the merits of their applications for adjustment of status.  Id. at 495.  And third, the Court found that, absent jurisdiction in the district court, the plaintiffs would not have been able to obtain any meaningful judicial review.  Id. at 496-98.

Not one of these points assists plaintiff here:  Ruiz Massieu directly challenges his deportability, and his claim is squarely governed by the statutory scheme; his district court suit goes directly to the merits of his deportability; and his claims will receive meaningful judicial review, if necessary, in this court after administrative exhaustion.  The Court's decision in McNary thus does not aid Ruiz Massieu here.

Our interpretation of McNary is consistent with our decision in Yi v. Maugans, 24 F.3d 500 (3d Cir. 1994), aff'g,

Yang v. Reno, 852 F. Supp. 316 (M.D. Pa. 1994). Yi v. Mauganswas an exclusion case implicating 1105a(b) & (c). We held that "in enacting 1105a(b) and (c), Congress permitted judicial challenges of orders of exclusion solely by way of habeas proceedings and only to those aliens who have exhausted their administrative remedies." Id. at 504. We distinguished McNaryand refused to condone plaintiffs' attempted "`end-run around the administrative process.'" Id. at 507 (citation omitted). We explained as follows:

> Nor would any of the other cases cited by Pan provide the court with authority to ignore the explicit requirements of 1105a in favor of a general grant of authority under 1331. Courts invoking 1331 jurisdiction have done so only when the challenged administrative practice, policy or regulation precluded adequate development of the administrative record and consequently meaningful review through the procedures set forth in 1105a, and/or when the challenged practice was collateral and divorced from the substantive aspects underlying the alien's claim[.] In this sense, the holdings are similar to McNary, and thus would be inapplicable in circumstances, as those present here, where judicial review is adequate and where the challenge relates to the merits of the final order.

24 F.3d at 506 (citations omitted). We concluded that we had to deny district court jurisdiction "where, as here, the challenge by the aliens is neither procedural nor collateral to the merits and where application of the specific statutory provisions would not preclude meaningful judicial review." Id. at 507 (footnote omitted).

As examples of true procedural challenges collateral to the merits, we cited the following: a class challenge alleging systematic inadequate translations of proceedings; a class challenge to actions of an immigration judge who refused to accept certain documents; and a class challenge to the Service's failure to give notice of the right to apply for asylum. Id. at 506-07. It is clear to us that Ruiz Massieu's challenge in this case is neither procedural nor collateral in any of these senses; on the contrary, this is a direct challenge, by an alien who is the subject of deportation proceedings, to the substantive ground of deportation and thus to the merits of the eventual final order.

2. Second, there is no doubt that plaintiff's claims can be afforded meaningful judicial review in this court after exhaustion. Although the immigration judge is not authorized to consider the constitutionality of the statute, this court can hear that challenge upon completion of the administrative proceedings under INS v. Chadha, 462 U.S. at 938 (review by court of appeals of final order of deportation includes "all matters on

which the validity of the final order is contingent"); see alsoNaranjo-Aguilera v. INS, 30 F.3d 1106, 1114 (9th Cir. 1994) ("Petitioners appealing order of deportation routinely bring statutory and constitutional challenges to INS regulations and policies.") (citations omitted); cf. Kreschollek v. Southern Stevedoring Co., 78 F.3d 868 (3d Cir. 1996) (permitting district court jurisdiction over claim under Longshore and Harbor Workers' Compensation Act where plaintiff's "claim that he has a constitutional right to a pretermination hearing is entirely collateral to his claim of entitlement to benefits" and where plaintiff "has alleged a sufficiently serious irreparable injury to lead us to conclude that the administrative review process is insufficient to afford him full relief").  Although plaintiff would prefer to have his claim heard by this court now rather than after the conclusion of the administrative process, we cannot upset the scheme created by Congress to provide plaintiff with a faster decision.  See, e.g., Maxon Marine, 39 F.3d at 147 ("[D]elay is not a valid ground for bypassing the procedures established by Congress for obtaining judicial review of agency action, procedures that include a mandatory resort to such administrative remedies as remain open to the aggrieved party, unless those remedies are palpably inadequate, which Maxon has not shown, resulting in serious injustice, which Maxon also has not shown."); see also Yang v. Reno, 852 F. Supp. at 326 (exhaustion required "even if another scheme might at times prove more speedy or efficient").

C.  1.  The district court found that notwithstanding the "express congressional intent" and "exclusive language of 106(a) and (c)," courts "have excused exhaustion under the INA for certain constitutional challenges."  915 F. Supp. at 692 (citing McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991); Sewak v. INS, 900 F.2d 667 (3d Cir. 1990); Rafeedie v. INS, 880 F.2d 506 (D.C. Cir. 1989)).  The court then weighed "the purposes underlying the exhaustion requirement against the potential injury to the plaintiff if he is forced to exhaust his administrative remedies."  915 F. Supp. at 693 (citations omitted).  The court concluded that the "exhaustion balance in this unusual case tips powerfully in plaintiff's favor."  Id. at 697.

We find this method of analysis misplaced in the circumstances of this case.  In light of the clear statutory language and congressional intent, we do not think that the courts possess the authority to excuse exhaustion whenever they conclude that a balancing of the relevant factors tips in that direction.  Rather, we believe that exhaustion is not required only if the claim asserted comes within the exception discussed in part II.B of this opinion, and as we have explained, this exception applies only if a plaintiff can establish that the claim being asserted is entirely collateral to the statute's review procedures.  Moreover, even if the plaintiff can make that showing, the plaintiff may also have to establish that meaningful review would be foreclosed absent initial review in the district court.  As already discussed, plaintiff in this case has failed to make either showing.  We emphasize here that resort to a

general exhaustion balancing test should be avoided where -- as the district court recognized is true here -- Congress has expressly required exhaustion of administrative remedies by statute.

2. We have held above that under the Immigration and Nationality Act plaintiff is required to pursue his administrative remedies and, if served with a final order of deportation, bring his challenge in this court thereafter. Given the congressional intent to require exhaustion of administrative remedies and to delay judicial review until the end of the administrative process, we need not consider whether sound judicial discretion counsels in favor of or against requiring exhaustion. Congress has already made that determination. We nonetheless note that, contrary to plaintiff's assertions, there are important and potentially dispositive issues that should be resolved in the administrative process, e.g., asylum, withholding of deportation, and the adjudication of the statutory exception contained in 8 U.S.C. 1251(a)(4)(C)(ii).

Plaintiff has at numerous times in this proceeding indicated an intention to seek asylum in this country. See, e.g., Plf. Opp. to Stay filed 3/1/96, at 2, 23, 25, Exh. 1, & Exh. 2. It is clear that any asylum claim would be heard by the immigration judge who was presiding over the deportation proceeding and that a failure to assert the asylum claim in the deportation proceeding would likely result in waiver of that claim. See 8 C.F.R. 208.4(c)(1) & (4). Combined with plaintiff's statements that he intends to pursue an asylum claim, the regulations indicate to us that, absent the district court's injunction, the immigration judge would have had occasion to consider both asylum and withholding of deportation arguments. While the asylum claim is within the discretion of the Attorney General, withholding of deportation shall be granted if the alien satisfies the relevant standards. 8 U.S.C. 1253(h)(1). Moreover, despite plaintiff's claim that the Attorney General has predetermined the asylum issue, we have no way of determining whether the Attorney General will change her mind regarding plaintiff's deportation after plaintiff presents the evidence supporting his asylum and withholding-of-deportation claims.

Also, plaintiff argued in the district court that he came within the statutory exception contained in 241(a)(4)(C)(ii). Under that exception, an alien who shows that he is being deported because of past statements that would be lawful within the United States shall not be deportable unless the Secretary of State personally determines that non-deportation would compromise a compelling United States foreign policy interest. See 241(a)(4)(C)(ii), 8 U.S.C. 1251(a)(4)(C)(ii) (incorporating 8 U.S.C. 1182(a)(3)(C)(ii) & (iii)). Plaintiff's statutory exception argument is not frivolous, and we have no way of knowing whether the Secretary would have made the necessary statutory finding. These issues could and should have been litigated before the immigration judge and the Board of Immigration Appeals.

In light of the above, we cannot agree with the district court's statement that "[n]ot one of the purposes

underlying the doctrine would be served by requiring exhaustion." 915 F. Supp. at 697. There are certainly issues to which the immigration judge and the Board of Immigration Appeals will be able to apply their expertise, and the resolution of a number of those issues could well resolve this matter without the need for any involvement by the federal courts. If this matter does end up in this court, at that point there will be no lingering doubt as to the administrative disposition of plaintiff's claims for asylum and withholding of deportation. Moreover, the court presumably will have the benefit of an administrative record applying the statute and perhaps the statutory exception. A number of the issues to be resolved through administrative exhaustion could entirely moot plaintiff's constitutional challenge, and this consideration cannot be deemed insignificant. E.g., Davis, supra,  15.5, at 332 ("[T]he Court has declined to resolve constitutional questions because of the petitioner's failure to exhaust administrative remedies. Moreover, those decisions are based on the important prudential principle that a court should not resolve a constitutional question if a dispute can be resolved on another basis that avoids the need to resolve the constitutional question.") (citations omitted).

Thus, even if a balancing test were appropriate in this case, we would find that exhaustion is required.

### III.

In sum, we hold that there is a fairly discernible congressional intent to delay federal court review of claims by aliens against whom deportation proceedings have been instituted until the conclusion of the administrative proceedings. We conclude that plaintiff must therefore exhaust his available administrative remedies prior to federal court consideration of his claims. We also hold that plaintiff's claims are not collateral to the Act's review provisions and that, if necessary, plaintiff will receive meaningful review of his claims in this court after final administrative action. In these circumstances, we hold that the balancing test applicable in cases of prudential exhaustion is improper here. Finally, although in no way essential to our holdings, we note that exhaustion in this case will serve important purposes and may even moot the need for any involvement by the federal courts.

For these reasons, we reverse the district court's order, and we remand this matter to the district court with a direction that plaintiff's complaint be dismissed.