# In re Mario Salvador RUIZ-MASSIEU, Respondent

## File A74 163 285 - Newark

*Decided as Amended June 10, 1999*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) In order to establish deportability under section 241(a)(4)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4)(C)(i) (1994), the Immigration and Naturalization Service has the burden of proving by clear, unequivocal, and convincing evidence that the Secretary of State has made a facially reasonable and bona fide determination that an alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

(2) A letter from the Secretary of State conveying the Secretary's determination that an alien's presence in this country would have potentially serious adverse foreign policy consequences for the United States, and stating facially reasonable and bona fide reasons for that determination, is presumptive and sufficient evidence that the alien is deportable under section 241(a)(4)(C)(i) of the Act, and the Service is not required to present additional evidence of deportability.

 (3) The Government is not required to permit an alien who is deemed to be deportable under section 241(a)(4)(C)(i) of the Act to depart the United States voluntarily prior to the initiation of  deportation proceedings where the alien's presence is pursuant to his voluntary decision to enter or seek admission to this country. *Matter of Badalamenti*, 19 I&N Dec. 623 (BIA 1988); *Matter of Yam*, 16 I&N Dec. 535 (BIA 1978); and *Matter of C-C-*, 3 I&N Dec. 221 (BIA 1948), distinguished.

(4) Extradition proceedings are separate and apart from deportation proceedings and the Government's success or failure in obtaining an order of extradition has no effect on deportation proceedings. *Matter of McMullen,* 17 I&N Dec. 542 (BIA 1980), *rev'd on other grounds*, 658 F.2d 1312 (9th Cir. 1981), *on remand, Matter of McMullen*, 19 I&N Dec. 90 (BIA 1984), *aff'd*, 788 F.2d 591 (9th Cir. 1986), followed.

Robert Frank, Esquire, Newark, New Jersey, for respondent

David Martin, of counsel, for the Immigration and Naturalization Service

Before: Board En Banc:  DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, COLE, MATHON, GUENDELSBERGER, JONES, GRANT, and MOSCATO, Board Members. Dissenting Opinion: ROSENBERG,

Board Member, joined by SCHMIDT, Chairman.[1]

GRANT, Board Member:

In a decision dated May 30, 1997, the Immigration Judge found the respondent not deportable under section 241(a)(4)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4)(C)(i) (1994), and terminated proceedings. The Immigration and Naturalization Service appealed. Oral argument was held at the Board of Immigration Appeals on May 27, 1998. The appeal will be sustained and the record will be remanded.

## I. FACTS AND PROCEDURAL HISTORY

The respondent is a native and citizen of Mexico, who served as the Deputy Attorney General of Mexico in 1993 and from May 1994 until he resigned that position on November 23, 1994. He was admitted to the United States as a nonimmigrant visitor for pleasure on March 2, 1995. Later that same day, he was arrested by the United States Customs Service, as he attempted to leave the United States, on account of his alleged failure to declare approximately $26,000 in currency. Charges in that case were subsequently dropped. An Order to Show Cause and Notice of Hearing (Form I-221) was issued on December 22, 1995. The respondent was charged with being deportable under section 241(a)(4)(C)(i) of the Act, based on a determination by the United States Secretary of State, Warren Christopher, dated October 2, 1995, that, in his opinion, the presence of the respondent in the United States may have serious adverse foreign policy consequences. The determination states that the failure to return the respondent

> would jeopardize our ability to work with Mexico on law enforcement matters. It might also cast a potentially chilling effect on other issues our two governments are addressing. . . . Should the U.S. Government not return Mr. Ruiz Massieu to Mexico, our support of such reforms [of the Mexican judicial system] would be seen as hollow and self-serving and would be a major setback for President Zedillo and our combined efforts to chart a new and effective course of U.S.-Mexican relations.

*See* Appendix.

Deportation proceedings were enjoined by a district court judge, who found the statutory provision at issue to be unconstitutional, but the United States Court of Appeals for the Third Circuit dissolved the injunction, ruling that the respondent was required first to exhaust his administrative

---

[1]On our own motion, we amend the June 10, 1999, order in this case to correct the list of Board Members who participated.

remedies. *Massieu v. Reno*, 915 F. Supp. 681 (D.N.J.), *rev'd and remanded*, 91 F.3d 416, 420 (3d Cir. 1996). According to the Service, the respondent faces charges of money laundering, criminal unjust enrichment, embezzlement, obstruction of justice, accessory after the fact, intimidation, and torture in Mexico. The Government has tried unsuccessfully four times to extradite the respondent on the basis of embezzlement and obstruction of justice charges brought in Mexico. *See generally Massieu v. Reno*, 915 F. Supp. 681.[2] In its appeal, the Service maintains that the Secretary of State's October 2, 1995, determination should be conclusive for the purpose of deportability under section 241(a)(4)(C)(i) of the Act. It requests that the Board reverse the decision of the Immigration Judge, find the respondent deportable, and remand the proceedings to allow the respondent the opportunity to apply for any applicable relief from deportation.

## II. GROUNDS OF DEPORTABILITY AND IMMIGRATION JUDGE'S DECISION

Pursuant to the statute, "an alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." Section 241(a)(4)(C)(i) of the Act.[3] The Service contends that the letter of the Secretary of State is sufficient to render the respondent deportable as charged. In the alternative, the Service contends that the Secretary gave in his letter facially valid reasons for his opinion, which is all that is required under the statute. *See Kleindienst v. Mandel,* 408 U.S. 753 (1972) (finding bona fide and facially legitimate reasons sufficient to deny a waiver for a nonimmigrant visa).

The Immigration Judge found that the Service failed to carry its burden of proof to show that the respondent is deportable by clear, unequivocal, and convincing evidence. *Woodby v. INS*, 385 U.S. 276 (1966). In particu-

---

[2]In an unrelated action, the United States Court of Appeals for the Fifth Circuit has affirmed a district court's judgment of forfeiture of United States currency held in a bank account in the respondent's name at the Texas Commerce Bank. *See United States v. $9,041,598.68,* 163 F.3d 238 (5th Cir. 1998), *aff'g* 976 F. Supp. 642 (S.D. Tex. 1997). However, we need not address this matter for purposes of this decision.

[3]The two exceptions to excludability set forth under section 212(a)(3)(C) of the Act, 8 U.S.C. § 1182(a)(3)(C) (1994), for government officials and those sought to be excluded on account of beliefs, statements, or associations apply also to deportation under section 241(a)(4)(C) of the *Act, but the respondent does not claim that either exception applies to him. See* section 241(a)(4)(C)(ii) of the Act. Section 241(a)(4)(C) was recodified without amendment as section 237(a)(4)(C) of the Act, 8 U.S.C. § 1227(a)(4)(C) (Supp. II 1996), by section 305(a)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-598 ("IIRIRA"). The amendment does not affect this case, which was initiated prior to the effective date of the IIRIRA.

lar, the Immigration Judge found that the Service failed to show by clear, unequivocal, and convincing evidence that the opinion of the Secretary of State was reasonable. She found that the determination of the Secretary of State alone was insufficient to demonstrate that the presence of the respondent could potentially produce serious adverse foreign policy consequences.

According to the Immigration Judge, the Service has failed to show what it is about the respondent's presence here that caused the Secretary to believe that our foreign policy will be affected; for example, there is no evidence in the record of a pending criminal case in Mexico. Furthermore, she noted, his presence here is involuntary. Finally, the Immigration Judge rejected as unsupported the argument that the letter from the Secretary of State is a certification binding on the Immigration Court and that its mere existence requires that the alien be found deportable.

## III. STATUTORY HISTORY

The authority of the Congress and executive branch to regulate the admission and status of aliens in the United States is virtually unrestricted. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953). The federal courts have long recognized that the political branches of the Federal Government have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country. *See Jean v. Nelson*, 727 F.2d 957, 964 (11th Cir. 1984) (en banc) (citing *Chae Chan Ping v. United States (The Chinese Exclusion Case)*, 130 U.S. 581 (1889)); *see also Reno v. Flores*, 507 U.S. 292 (1993). "The power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers, 'with such opportunity for judicial review of their action as Congress may see fit to authorize or permit.'" *Carlson v. Landon*, 342 U.S. 524, 537 (1952) (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 713-15 (1893)).

United States immigration law has long allowed the exclusion of aliens whose activities would be detrimental to the United States or whom the Secretary of State had reason to believe would engage in certain illegal activities, or who belonged or had belonged to certain organizations. Former section 212(a)(27) of the Act, 8 U.S.C. § 1182(a)(27) (1988), barred the entry of aliens whom the consular officer or the Attorney General knew or had reason to believe were seeking entry "solely, principally, or incidentally" to engage in activities which would be prejudicial to the public interest or endanger the welfare, safety, or security of the United States. Former section 241(a)(7) of the Act, 8 U.S.C. § 1251(a)(7) (1988), provided for deportation of an alien who was engaged, had engaged, or at any time after

entry had a purpose to engage in any of the activities described in sections 212(a)(27) or (29) of the Act.[4] In interpreting these provisions, the federal courts generally held that an alien has no standing to object to his or her exclusion under these provisions on the ground that an unadmitted nonresident alien has no constitutional right of entry into the United States. *See, e.g., Kleindienst v. Mandel, supra* (Marxist). The courts further held that an alien may be denied entrance on grounds which would be constitutionally suspect or impermissible in the context of domestic legislation. *Fiallo v. Levi,* 406 F. Supp. 162 (E.D.N.Y. 1975), *aff'd sub nom. Fiallo v. Bell, supra; see also Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985); *accord Mathews v. Diaz*, 426 U.S. 67, 80 (1976); *cf. Adams v. Baker*, 909 F.2d 643 (1st Cir. 1990); *Rafeedie v. INS*, 795 F. Supp. 13 (D.D.C. 1992). However, two courts of appeals held that the Department of State could not prevent persons from entering the United States on the belief that their mere presence or speeches would pose a threat to United States interests. *Allende v. Schultz,* 845 F.2d 1111 (1st Cir. 1988); *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) (per curiam).

The Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ("IMMACT 90"), repealed sections 212(a)(27) and 241(a)(7) of the Act and replaced them with new provisions designed to address the concerns presented in cases such as *Abourezk v. Reagan, supra*, and *Allende v. Schultz, supra.*[5] Under these new provisions, the standard for exclusion or deportation was squarely focused on a foreign policy determination entrusted to the Secretary of State. The Secretary must have reasonable ground to believe that the alien's entry or proposed activities, in the case of the exclusion provision, or presence or activities in the United States, in the case of the

---

[4]*See, e.g., Adams v. Baker*, 909 F.2d 643 (1st Cir. 1990) (Irish Republican Army). *But see Allende v. Schultz*, 845 F.2d 1111 (1st Cir. 1988) (Communist party); *Rafeedie v. INS*, 688 F. Supp. 729 (D.D.C. 1988), *modified*, 880 F.2d 506 (D.C. Cir. 1989), *on remand*, 795 F. Supp. 13 (D.D.C. 1992) (Palestine Liberation Organization).

[5]Under current law there is some ambiguity as to the authority of the Executive Branch to exclude aliens on foreign policy grounds. . . . The foreign policy provision in this title would establish a single clear standard for foreign policy exclusions (which is designated as 212(a)(3)(C) of the INA. The conferees believe that granting an alien admission to the United States is not a sign of approval or agreement and the conferees therefore expect that, with the enactment of this provision, aliens will be excluded not merely because of the potential signal that might be sent because of their admission, but when there would be a clear negative foreign policy impact associated with their admission. . . . Specifically, under this provision, an alien could be excluded only if the Secretary of State has reasonable ground to believe an alien's entry or proposed activities within the United States would have potentially serious adverse foreign policy consequences.

H.R. Conf. Rep. No. 101-955, at 128-29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6793-94.

837

deportation provision, "would have potentially serious adverse foreign policy consequences." Sections 212(a)(3)(C)(i), 241(a)(4)(C)(i) of the Act, 8 U.S.C. §§ 1182(a)(3)(C)(i), 1251(a)(4)(C)(i) (Supp. II 1990). Furthermore, specific exceptions were provided to protect against the exclusion or deportation of aliens solely on the grounds of beliefs, statements, or associations which would be lawful if performed within the United States. In such cases, the alien may not be excluded or deported unless the Secretary personally determines that the alien's admission or presence would compromise a compelling United States foreign policy interest, and such determination is communicated to the appropriate committees of the House of Representatives and the Senate. *See* sections 212(a)(3)(C)(ii)-(iv), 241(a)(4)(C)(ii) of the Act. The conference report for the IMMACT 90 emphasized that only a "potential" for serious foreign policy consequences is required under the exclusion provision (as opposed to the more stringent finding of compelling foreign policy interest required under the exception to that provision). H.R. Conf. Rep. No. 101-955, at 129 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6794.

In the present case, no allegations have been made regarding the respondent's activities. The issue of deportability turns solely on his presence in this country. Therefore, the respondent makes no claim to be eligible for the exception in section 241(a)(4)(C)(ii) of the Act for beliefs, statements, or associations which would be lawful within the United States.

The provision of the revised statute at issue here has been used very rarely. In *Matter of Khalifah*, 21 I&N Dec. 107 (BIA 1995), the only published Board case involving section 241(a)(4)(C) of the Act, the Board upheld the Immigration Judge, who denied release on bond to an alien facing deportation under section 241(a)(4)(C) of the Act. The only discussion of the provision of the Act before us in the federal courts is to be found in the decisions of the district court and the court of appeals in this matter. *See Massieu v. Reno, supra*. In the absence of direct precedent, the Immigration Judge and the respondent have cited to cases which predate the Immigration Act of 1990. These cases considered the provisions of the Act allowing the Government to bar the entry of one whose activities in the United States would be detrimental to United States interests. *See* sections 212(a)(27), (28) of the Act; *Allende v. Schultz, supra; see also Abourezk v. Reagan, supra; City of New York v. Baker,* 878 F.2d 507 (D.C. Cir. 1989) (same case). However, these cases are of limited relevance for two reasons. First, we are without jurisdiction to entertain a constitutional challenge such as those adjudicated in the cited cases.[6] Second, the provision at issue in this case

---

[6]The parties agree that the Board has no jurisdiction to consider allegations of the unconstitutionality of the statute it administers, such as those allegations which were sustained by the district court in *Massieu v. Reno,* 915 F. Supp. 681. *See Matter of C-,* 20 I&N

differs substantially from the former exclusion grounds. Accordingly, our interpretation of section 241(a)(4)(C) of the Act is not bound by prior judicial or administrative determinations regarding related, but distinct, provisions.

## IV. POSITIONS OF THE PARTIES

The Service argues that the Attorney General has no authority to inquire into the reasonableness of the Secretary of State's determination, pursuant to section 241(a)(4)(C)(i) of the Act, that there is a "reasonable ground to believe" that a particular alien's presence in the United States poses potentially serious adverse foreign policy consequences. The Service contends that the language employed in section 241(a)(4)(C)(i), read together with section 103 of the Act, 8 U.S.C. § 1103 (1994), "divests the Attorney General, and, therefore, the Immigration Judge, of jurisdiction to review determinations made by the Secretary of State" pursuant to section 241(a)(4)(C)(i). This is so because the Secretary's determination is primarily a foreign relations issue within the expertise of the Secretary of State, and not a question of legal interpretation within the Attorney General's expertise; therefore, the Attorney General or her agents have no jurisdiction to review determinations made by the Secretary of State pursuant to the authority delegated to the Secretary under section 241(a)(4)(C) of the Act. *See* section 103 of the Act.[7]

The decision of the Immigration Judge, according to the Service, effectively rewrote this provision to eliminate the determinative role of the Secretary of State and to require the Service to prove to the Immigration Judge's satisfaction, by clear, unequivocal, and convincing evidence, that there are reasonable grounds to believe that the alien's presence could harm the nation's foreign policy interests. On the contrary, the Service argues, review of the Secretary of State's determination by the Immigration Judge should be "ministerial," and limited to matters such as "form and origin."

---

Dec. 529, 532 (BIA 1992); *Matter of Hernandez-Puente*, 20 I&N Dec. 335, 339 (BIA 1991); *Matter of Fede*, 20 I&N Dec. 35, 36 (BIA 1989); *Matter of Valdovinos*, 18 I&N Dec. 343, 345 (BIA 1982); *Matter of Cenatice*, 16 I&N Dec. 162, 166 (BIA 1977); *Matter of L-*, 4 I&N Dec. 556, 557 (BIA 1951).

[7]The Attorney General shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens, except insofar as this Act or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

Section 103(a) of the Act.

At oral argument, the Service stated that the requirement in section 241(a)(4)(C)(i) that there be a reasonable ground to believe that an alien's presence would have potentially serious adverse foreign policy consequences is intended to guide the decisions of the Secretary of State and constitutes a direction by Congress for the Secretary to apply a higher standard than the previous "prejudice to the public interest" standard set forth in former section 212(a)(27) of the Act. The "reasonable ground" standard does not constitute an independent basis for review of the Secretary's determination within the executive branch, and that determination is binding on the Service and the Executive Office for Immigration Review.[8]  At most, the Service contends, any review by the Immigration Judge must be highly deferential and thus limited to a determination whether there is a facially legitimate and bona fide reason for the Secretary's determination.[9]

The respondent argues that, just as in other deportation proceedings, the Service has the burden of establishing deportability by clear, unequivocal, and convincing evidence. In this case, the Immigration Judge correctly inquired into whether the Secretary of State had reasonable ground for his belief and found that the Service has failed to demonstrate reasonable ground for that belief. For example, the Service failed to support its case by providing any evidence other than the Secretary of State's letter, which provided no opportunity for the respondent to challenge the determination. In cases involving security issues, the Service has provided significant evidence in support of its contentions. *See, e.g., Adams v. Baker, supra.*

The respondent further asserts that the letter of the Secretary of State is also stale. The Service has not demonstrated that intervening events have not superseded the opinion expressed in 1995 by the then Secretary. According to the respondent, application of this standard of review does not violate the required deference to the opinion of the Secretary of State. The statute contemplates that the Attorney General will have the final word in matters of law. *See* section 103 of the Act. If the Immigration Judge has no role in deciding the issue of deportability, Congress would not have placed this provision in the section of the Act dealing with deportation after a hearing before an Immigration Judge. Furthermore, the Secretary of State should not be allowed to achieve indirectly the extradition of the respondent to Mexico where federal magistrates have denied extradition four times based on a lack of probable cause.

## V. DISCUSSION

[8]The Service indicated at oral argument that cabinet-level discussion would be the appropriate forum for the Attorney General to address any concerns she may have regarding a specific determination by the Secretary of State.

[9]The Service did not argue that judicial review of such a determination is precluded, but indicated that any such review would have to be highly deferential to the Secretary's foreign policy determination.

## A. Nature of Respondent's Presence

We find that the respondent is present in the United States by virtue of his voluntary entry. The Government, therefore, is not required to allow him the option to leave the United States voluntarily, if the Government decides that his presence here may potentially have adverse foreign policy consequences pursuant to section 241(a)(4)(C)(i) of the Act. Section 244(e)(1) of the Act, 8 U.S.C. § 1254(e)(1) (1994), specifically precludes the privilege of voluntary departure in lieu of deportation after a hearing to aliens deportable under section 241(a)(4) of the Act. *Cf.* section 244(a)(2) of the Act.

The Immigration Judge has cited to cases holding that an alien held in the United States must be allowed the opportunity to leave before proceedings are initiated. These cases are clearly distinguishable from this case on the facts. *Matter of Badalamenti*, 19 I&N Dec. 623 (BIA 1988), involved an alien who was brought to the United States for prosecution. His entry was involuntary. *Matter of C-C-,* 3 I&N Dec. 221 (BIA 1948), involved an alien who was held in custody pending trial for a criminal charge past the time of his authorized stay. The Board held that he was not deportable as an overstay under the principle that the law does not compel the impossible. *Id.* at 222. The respondent in this case has not been charged with being deportable as an overstay. Finally, in *Matter of Yam*, 16 I&N Dec. 535 (BIA 1978), the alien also did not enter the United States voluntarily. In fact, the Board found that he should have been in exclusion proceedings. *Id.* at 537.

The respondent in this case entered the United States voluntarily and for his own private reasons. Accordingly, he subjected himself to our jurisdiction and our laws. It is the judgment of the Secretary of State that his presence here has potentially serious adverse foreign policy consequences for the United States. His entry into the United States is, by itself, the "presence" required for deportability under section 241(a)(4)(C) of the Act.

## B. Standard of Review and Burden of Proof

This case presents a clear contrast. The respondent contends that the Immigration Judge was correct to require that the Service prove independently that the Secretary of State had a valid basis for his determination that the respondent's presence would have potentially serious adverse foreign policy consequences. This logically would require a presentation of evidence and independent review by the Immigration Judge regarding whether that evidence was sufficient to support the Secretary's determination. The Service contends that once the Secretary has issued such a determination, the role of the Immigration Judge, and indeed that of the Attorney General herself, is purely ministerial:  to confirm that the respondent is an alien and that the Secretary's letter is genuine and pertains to the respondent.

We conclude that Congress' decision to require a specific determination by the Secretary of State, based on foreign policy interests, to establish deportability under section 241(a)(4)(C)(i) of the Act, coupled with the division of authority in section 103 of the Act between the Attorney General and the Secretary of State, make it clear that the Secretary of State's reasonable determination in this case should be treated as conclusive evidence of the respondent's deportability. The Immigration Judge thus erred in holding that the Service is obliged to present clear, unequivocal, and convincing evidence in support of the Secretary of State's belief. The requirement that the Service demonstrate that the respondent is deportable by clear, unequivocal, and convincing evidence, *Woodby v. INS, supra*, and 8 C.F.R. § 242.14(a) (1997), is met by the Secretary's facially reasonable and bona fide determination that the respondent's presence here would cause potentially serious adverse foreign policy consequences for the United States.

The respondent's position would, as the Service has argued, fundamentally rewrite the text of section 241(a)(4)(C)(i) of the Act. A two-step inquiry would be required: first, evidence that the Secretary of State has made a determination based on foreign policy interests, and second, that there is clear, unequivocal, and convincing evidence that this determination is based on a reasonable ground. The second inquiry would necessarily require an evaluation of what, in fact, are the foreign policy interests of the United States, and thus leave open the possibility that aliens such as the respondent could contest, before an Immigration Judge, whether such foreign policy interests are themselves reasonable.

Such review is not contemplated by section 241(a)(4)(C)(i) of the Act. This provision grants exclusive authority to the Secretary of State to determine whether there is a "reasonable ground" to believe that the alien's presence could have the requisite adverse foreign policy impact. Neither the Attorney General nor her delegates have a role in that basic determination. Otherwise, an alien could be deported under this provision if the *Attorney General* had reasonable ground to believe that the alien's presence would cause the requisite foreign policy consequences. This is not how the provision reads.

We are further persuaded in this position by several facts. First, the Attorney General did have authority, before the IMMACT 90, to determine independently that an alien's admission to the United States would be prejudicial to the public interest or endanger the security or the welfare of the United States. No participation by the Secretary of State was required either to exclude an alien under section 212(a)(27) or to deport an alien under section 241(a)(7) of the Act. Under the provisions enacted in the IMMACT 90, however, Congress has explicitly and deliberately carved out a provision that requires a foreign policy determination by the Secretary of State before an alien can be excluded or removed.

Second, the role of the Secretary of State under section 241(a)(4)(C)(i)

of the Act is sui generis. In no other deportation provision is the Secretary assigned such authority. Even within the cluster of deportation grounds in section 237(a)(4) of the Act, 8 U.S.C. § 1227(a)(4) (Supp. II 1996), identified as "Security and Related Grounds," subparagraph (C) is the only ground that provides a role for the Secretary of State. For all other grounds, including those that involve espionage, threats to the national security, or violent opposition to or overthrow of the Government of the United States, the role of the Attorney General is exclusive and paramount. *See* sections 237(a)(4)(A)(i)-(iii) of the Act.

Third, absent a determination by the Secretary of State that an alien's activities or presence in the United States would cause potentially serious adverse foreign policy consequences, the Service cannot initiate deportation proceedings under section 241(a)(4)(C)(i) of the Act. The Immigration Judge would have no jurisdiction over such proceedings, other than to order their termination. It is unlikely that Congress, having made the Secretary's foreign policy determination essential for such proceedings to be initiated, would then grant an Immigration Judge and this Board authority to question the validity of that determination.

The argument that deportability under section 241(a)(4)(C)(i) of the Act should be decided in the same manner as other grounds of deportation is unavailing.[10] No other ground of deportation assigns a specific and essential role to the Secretary of State. The fact that this ground has been included in the same section as other grounds of deportation that do require a more active fact-finding role by the Immigration Judge is irrelevant: this is a ground of deportability, and regardless of who is responsible for making the determination of deportability, and under what standard of proof, it was perfectly reasonable for Congress to include it among the other grounds of deportability. Furthermore, the fact that Congress did not provide special procedures for the handling of such cases, as it has in the case of criminal aliens or alien terrorists, does not diminish the conclusive effect of the Secretary of State's determination. Under the plain terms of section 241(a)(4)(C)(i) of the Act, deportability is established in a manner different from many other grounds of deportation. The fact that Congress did not provide a special form of proceeding in such cases is not determinative.

Finally, the respondent's argument that the Service's burden in this case should apply equally to all elements of the charge, as in other deportation

---

[10]For example, the respondent argues that while the issues in this case are similar to those in *Adams v. Baker, supra*, the Government here has provided far less evidence, thus rendering the record deficient. The issue in *Adams*, however, was significantly different: the Service, in seeking to establish excludability under former section 212(a)(28)(F) of the Act, was required to show that the applicant was a member of, or affiliated with, an organization which advocated terrorism. No determination by the Secretary of State was involved. *Id.* at 648-49.

proceedings, ignores the fundamentally ministerial aspect of the Immigration Judge's role in many such proceedings. For example, it is well settled that an alien charged with deportability on criminal grounds cannot relitigate the basis of a conviction before the Immigration Judge. *Matter of Roberts,* 20 I&N Dec. 294 (BIA 1991); *Matter of Fortis*, 14 I&N Dec. 576 (BIA 1974); *see also Matter of Mendez*, 21 I&N Dec. 296 (BIA 1996); *Matter of Reyes*, 20 I&N Dec. 789 (BIA 1994). An alien duly convicted by a federal or state court, and thus rendered deportable, cannot force the Service to establish that the conviction was "proper" or "reasonable." The record of conviction is determinative. 8 C.F.R. § 3.41 (1997); *Contreras v. Schiltgen,* 122 F.3d 30, 32 (9th Cir. 1997), *aff'd*, 151 F.3d 906, 908 (9th Cir. 1998); *Pablo v. INS*, 72 F.3d 110, 113 (9th Cir. 1995); *Zinnanti v. INS*, 651 F.2d 420, 421 (5th Cir. 1981); *see also Matter of Mendez, supra; Matter of Reyes, supra.*

It might be argued that a record of criminal conviction presents a different case because it is based on a determination of guilt following a formal judicial proceeding, as opposed to the Secretary of State's unilateral judgment regarding adverse foreign policy consequences. That argument, however, is properly directed at Congress' decision to assign authority under section 241(a)(4)(C)(i) of the Act to the Secretary of State. We are obliged to apply the laws as written by Congress and are without jurisdiction to entertain challenges to the validity of such laws under the Constitution. *See Matter of Punu*, 22 I&N Dec. 3364, at 8 (BIA 1998); *Matter of Hernandez-Puente*, 20 I&N Dec. 335 (BIA 1991); *Matter of Fede*, 20 I&N Dec. 35 (BIA 1989); *Matter of Valdovinos*, 18 I&N Dec. 343 (BIA 1982); *Matter of Cenatice*, 16 I&N Dec. 162 (BIA 1977); *Matter of L-,* 4 I&N Dec. 556 (BIA 1951). In the scheme adopted by Congress, the Secretary of State's determination as outlined in section 241(a)(4)(C)(i) of the Act is equivalent to a duly certified record of criminal conviction by a state or federal court. The requirements of administrative due process are satisfied once the alien is notified that the basis for the charges against him is a determination by the Secretary under section 241(a)(4)(C)(i) of the Act.

Adopting the respondent's argument would necessarily require the Immigration Judge and this Board to intrude into the realm of foreign policy. The Secretary of State has the responsibility to implement the foreign policy of the United States. 22 U.S.C. § 2656 (1994). He has the power under the Immigration and Nationality Act to act independently of the Attorney General, where authorized to do so. Section 103(a)(1) of the Act. Section 241(a)(4)(C) of the Act specifically entrusts to the Secretary of State the determination of the potentially serious adverse foreign policy consequences of an alien's presence here. No other person is given the responsibility to make this determination and presumably no one would be in a better position to decide whether United States foreign policy would be adversely affected.[11] We have before us a letter stating that the Secretary of

State has made this determination. As noted, it would be impossible to question or alter this decision without proceeding to an examination of the foreign policy of the United States and balancing the various considerations of that policy against alternative competing policies. For these and similar reasons, questions concerning foreign relations are often considered nonjusticiable "political questions." *See Mathews v. Diaz, supra*, at 82 n.21 (citing *Baker v. Carr*, 369 U.S. 186 (1962)); *Shaughnessy v. United States ex rel. Mezei, supra; Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *Fong Yue Ting v. United States, supra,* at 712.

For an example, we need only look to the opinion in the present case. The Immigration Judge held that the Service must produce more than clear, unequivocal, and convincing evidence that the Secretary of State held a facially reasonable opinion that the alien's presence would have adverse foreign policy consequences. She required the Service to convince her by clear, unequivocal, and convincing evidence that the Secretary's opinion is reasonable. The Immigration Judge found that the Service had not shown that the opinion of the Secretary of State is reasonable.[12] Consequently, in the absence of further evidence, she substituted her judgment for that of the Secretary of State. This standard of inquiry would entangle the Immigration Court in matters of foreign policy and involve that court in weighing the importance of various factors in an area in which it has no special expertise. Such an in-depth examination could well require the Service to proffer secret or confidential information and expert witnesses, or involve a deposition of the Secretary of State. There is no indication that Congress contemplated an Immigration Judge, or even the Attorney General, overruling the Secretary of State on a question of foreign policy.[13]

We also believe, however, that the language of section 241(a)(4)(C)(i) of the Act, together with the structure of responsibility set forth in section 103, require that the Secretary of State have set forth a facially reasonable and bona fide basis for a determination under section 241(a)(4)(C)(i). Section 103 of the Act provides that in the administration of the Act, the determinations and rulings of the Attorney General on all questions of law

---

[11]*See* Timothy P. McIlmail, *The General, the Secretary, and the alien candidate: The operation of the "potentially serious foreign policy risk" grounds of deportability and excludability under the Immigration and Nationality Act,* 10 Geo. Immigr. L.J. 657 (1996).

[12]According to the Immigration Judge, "If the Secretary of State relies upon some other ground, a ground that this court might find reasonable, his letter fails to refer to it and the Service fails to present evidence of [what] it might be."

[13]Because it is the opinion of the Secretary of State that decides the issue, there is no prejudice to the respondent if he is not allowed to cross-examine the Secretary regarding the contents of the letter. We need not consider at this time potential prejudice in other situations, such as where the respondent challenges whether the Secretary signed the letter, or whether he is the person named.

are controlling. Despite being urged to do so by the respondent, we will not expand this authority over legal questions to subsume the independent authority over powers, functions, and duties expressly assigned to the Secretary of State in the realm of foreign policy. Nevertheless, the law is equally clear that the Secretary must state that he or she has a "reasonable ground" in making the determination under section 241(a)(4)(C)(i).

Thus, we find that it is within the province of the Attorney General and her delegates to ensure that the Secretary of State's determination, on its face, rests on the Secretary's judgments regarding foreign policy. We apply the standard of facial reasonableness that was adopted by the Supreme Court in *Kleindienst v. Mandel, supra*, at 770:

> [W]hen the Executive exercises this power [to exclude aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.

We need not consider at this time the purely speculative hypothetical in which the Secretary of State gives no reason whatsoever for his or her determination under section 241(a)(4)(C)(i) of the Act, or a situation where the reasons given are clearly unreasonable.[14]

The reasons given in the October 5, 1995, letter of the Secretary of State are facially legitimate and bona fide. There is no question, and no contrary allegation has been made on this record, that the reasons stated therein do not proceed from a judgment involving the foreign policy interests of the United States. We find that the October 5, 1995, letter of the Secretary of State explaining his determination that the respondent's presence here has potentially serious adverse foreign policy consequences for the United States, and setting forth his reasons for so concluding, meets the Service's burden to establish by clear, unequivocal, and convincing evidence that the respondent is deportable under section 241(a)(4)(C)(i) of the Act.

## C. Other Issues

The respondent argues that the Attorney General should not be allowed to deport him, having failed in her attempt to comply with the Mexican Government's attempt to extradite him to Mexico. Extradition proceedings are separate and apart from any immigration proceeding. *Matter of McMullen*, 17 I&N Dec. 542, 548 (BIA 1980), *rev'd on other grounds*, 658 F.2d 1312 (9th Cir. 1981), *on remand, Matter of McMullen*, 19 I&N Dec.

---

[14]The Court in *Kleindienst v. Mandel, supra*, at 769-70, also reserved judgment as to whether "any reason or no reason may be given," because the reason given was "facially legitimate and bona fide."

90 (BIA 1984), *aff'd*, 788 F.2d 591 (9th Cir. 1986). The standards of proof are different. As the Service has pointed out, not all of the charges brought in Mexico were cited as a basis for extradition. Also, the existence of criminal charges is not the only possible basis for a determination that the respondent's presence may have adverse foreign policy consequences. We note that other aliens have been deported after extradition requests were denied by the courts. In *Matter of McMullen*, 17 I&N Dec. 542, the Government petition for extradition was denied. The respondent was nevertheless found deportable. The Board stated:

> Decisions resulting from extradition proceedings are not entitled to res judicata effect in later proceedings. *Hooker v. Klein*, 573 F.2d 1360 (9th Cir. 1978). *See also Jhirad v. Ferrandina*, 536 F.2d 478 (2d Cir. 1976). . . . Moreover, the res judicata bar goes into effect only where a valid, final judgment has been rendered on the merits (*Hooker*, *supra*), and it is well established that decisions and orders regarding extraditability "embody no judgment on the guilt or innocence of the accused . . . ." *Jhirad, supra*, at 482. . . . The issues involved in a deportation hearing differ from those involved in an extradition case, and resolution of even a common issue in one proceeding is not binding in the other.

*Id.* at 548; *see also Matter of Perez-Jimenez*, 10 I&N Dec. 309 (BIA 1963).

In *Matter of Doherty*, 599 F. Supp. 270 (S.D.N.Y. 1984), the respondent was not extradited because the judge, sitting as a magistrate, found that the crimes he committed were political; nevertheless, Doherty was found deportable based on his own concession of deportability. The Attorney General rejected his designation of a country of deportation under section 243(a) of the Act, 8 U.S.C. § 1253(a) (1982), as prejudicial to the interests of the United States. The United States Court of Appeals for the Second Circuit found that section 243(a) gives the Attorney General broad discretion to determine what constitutes prejudice to national interests. *Doherty v. United States Dep't of Justice,* 908 F.2d 1108 (2d Cir. 1990), *rev'd on other grounds, INS v. Doherty,* 502 U.S. 314 (1992); *see also Doherty v. Meese,* 808 F.2d 938, 943 (2d Cir. 1986); *Linnas v. INS*, 790 F.2d 1024 (2d Cir. 1986), *cert. denied*, 479 U.S. 995 (1987).

## D. Further Proceedings

Section 243(a) of the Act (now section 241(b)(2) of the Act, 8 U.S.C. § 1231(b)(2) (Supp. II 1996)) allows the alien to name one country to which he may be deported. Because the Immigration Judge terminated proceedings, the respondent was not asked to name a country of deportation pursuant to section 243(a) of the Act. That provision (now at section 241(b)(2)(C)(iv) of the Act) also allows the Attorney General to disregard the designation if the Attorney General decides that removing the alien to the country named is prejudicial to the interests of the United States. The Attorney General took such action in *Matter of Doherty, supra. Doherty v.*

*United States Dep't of Justice, supra*, at 1112. On remand, the respondent should be given the opportunity to name a country of deportation and to apply for any relief for which he may be eligible under the Act. Finally, the record indicates that if the case is remanded for further proceedings, the respondent may submit an application for asylum. At oral argument, the Service agreed that neither the statute nor the regulations preclude such an application.

**ORDER:** The appeal of the Immigration and Naturalization Service is sustained.

**FURTHER ORDER:** The Immigration Judge's order of May 30, 1997, is vacated, and the record is remanded to the Immigration Court for further proceedings consistent with the foregoing opinion.

Board Members Lauri S. Filppu and Lori L. Scialabba did not participate in the decision in this case.

**APPENDIX**

THE SECRETARY OF STATE
WASHINGTON
OCTOBER 2, 1995

Dear Madam Attorney General:

 I am writing to inform you that, pursuant to Section 241(a)(4)(C) of the Immigration and Nationality Act, 8 U.S.C. section 1251(a)(4)(C), I have concluded that the presence of Mario Ruiz Massieu in the United States would have potentially serious foreign policy consequences for the United States. Accordingly, I request that you take all steps possible, consistent with the Immigration and Nationality Act and other relevant law, to effect his deportation to Mexico.

My decision to invoke INA section 241(a)(4)(C) with respect to Mr. Ruiz Massieu is based on the following considerations: As you are well aware, the United States and Mexico have made tremendous progress in the past five years in strengthening one of our most important bilateral relationships. The range of issues that unite our two nations — from combating international drug trafficking, to addressing vexing problems of legal and illegal migration, to fortifying trade and investment in one of the world's largest and fastest growing markets — is complex and varied.

One aspect of our relationship that has received the utmost attention from both governments is our ability to cooperate to confront criminality on

both sides of the border. We have seen successes on this front, but we continue to seek enhanced cooperation. With easy transit between the United States and Mexico and extensive and ever-increasing ties, this is an area of vital importance to the United States. Our inability to return to Mexico Mr. Ruiz Massieu — a case the Mexican Presidency has told us is of the highest importance — would jeopardize our ability to work with Mexico on law enforcement matters. It might also cast a potentially chilling effect on other issues our two governments are addressing.

Furthermore, the case in question involves charges against the former second ranking law enforcement authority in Mexico and a man connected through his circle of family and friends to the center of power in Mexican politics. Serious allegations against such a high former official are unprecedented in modern Mexico. The case against Mr. Ruiz Massieu and the arrest and trial for related crimes of Mr. Raul Salinas, brother of the former President, were the dramatic and unequivocal signs of the determination of President Zedillo and his Attorney General to break the so-called "culture of impunity" that long protected corrupt politicians, officials and other powerful elite from being held accountable for their actions and crimes. President Zedillo's anti-corruption drive has resonated throughout Mexico and continues to receive strong support from the Mexican people.

The U.S. Government has consistently urged Mexico to take the steps towards reform in its justice system that President Zedillo is so forcefully pursuing. The ability to prosecute Mr. Ruiz Massieu and other powerful individuals in Mexico for the crimes of which they are accused is key to the success of Zedillo's pledge to transform totally the judicial and law enforcement system and to rid Mexico of corruption and abuse of power. Should the U.S. Government not return Mr. Ruiz Massieu to Mexico, our support of such reforms would be seen as hollow and self-serving and would be a major setback for President Zedillo and our combined efforts to chart a new and effective course of U.S.-Mexican relations.

Our efforts to remove Mr. Ruiz Massieu from the United States should be directed at achieving his direct return to Mexico. When apprehended in New Jersey, Mr. Ruiz Massieu was attempting to depart the United States just days after being called for questioning in Mexico with regard to the crimes with which he was subsequently charged. If our efforts to remove him from the United States result in his ability to depart to a destination other than Mexico, the U.S. Government will almost certainly be viewed by Mexican officials and the Mexican public as not only permitting, but also aiding his successful escape from justice.

Accordingly, I have concluded that Mr. Ruiz Massieu's presence in the United States would have potentially serious adverse foreign policy consequences for the United States, as provided for in INA section 241(a)(4)(C). I request that you take all reasonable efforts to ensure Mr. Ruiz Massieu's expeditious deportation from the United States. Further, in light of the

Mexican Government's interest in having Mr. Ruiz Massieu returned to Mexico, I also request that you do everything possible, consistent with the Immigration and Nationality Act, to effect his deportation to Mexico.

Sincerely,

/s/ Warren Christopher

Warren Christopher


*DISSENTING OPINION:* Lory D. Rosenberg, Board Member, in which Paul W. Schmidt, Chairman, joined

I respectfully dissent.

"The facts of this case read more like a best-selling novel than a typical deportation proceeding," stated the District Court for the District of New Jersey, in *Massieu v. Reno*, 915 F. Supp. 681, 686 (D.N.J.), *rev'd and remanded*, 91 F.3d 416 (3d Cir. 1996).[1] I agree.

The respondent, a prominent international figure, has been detained by the Immigration and Naturalization Service for nearly 4 years, and his situation raises constitutional questions that have engendered significant federal court litigation to date. Although the federal court decisions that have been issued in relation to his predicament are not dispositive of the principal issue before us on appeal, they do inform that issue, and the factual matters they describe have some bearing on our ultimate disposition of his appeal. Consequently, I find that the factual evaluation by the district court

---

[1] *See Massieu v. Reno*, 91 F.3d 416 (3d Cir. 1996) (quoting *Massieu v. Reno,* 915 F. Supp. 681 (D.N.J. 1996)).

> On February 28, 1996, the district court issued an order declaring § 241(a)(4)(C)(i) unconstitutional on three separate grounds. First, the court held that the provision is void for vagueness because it does not provide adequate notice to aliens of the standards with which they must conform and does not furnish adequate guidelines for law enforcement. Second, the court held that § 241(a)(4)(C)(i) violates procedural due process; the court reasoned that the provision deprives an alien of a meaningful opportunity to be heard since the Secretary of State's determination that he falls within the statutory standard is allegedly unreviewable. Finally, the court held that § 241(a)(4)(C)(i) represents an unconstitutional delegation of legislative power because it lacks "sufficiently intelligible standards to direct the Secretary's exercise of discretion and to enable the court to review the exercise thereof."

*Id.* at 418 (footnote omitted).

of the complex circumstances resulting in the respondent's case coming before us is pertinent to our consideration of his appeal. In addition, I recognize that the United States Court of Appeals for the Third Circuit did not reach the merits of the constitutional questions decided by the district court, but held that "the district lacked jurisdiction to entertain plaintiff's claims . . . [because] [u]nder § 106 of the INA, 8 U.S.C. § 1105a, if plaintiff wished to challenge the efforts to deport him, he was required to exhaust available administrative remedies and then petition for review in this court." *Massieu v. Reno*, 91 F.3d at 417. However, I note that the Third Circuit anticipated that "[t]here are certainly issues to which the immigration judge and the Board of Immigration Appeals will be able to apply their expertise, and the resolution of a number of those issues could well resolve this matter without the need for any involvement by the federal courts." *Id.* at 426.

The district court found:

> Mr. Ruiz Massieu entered this country legally and is not alleged to have committed any act within this country which requires his deportation. Nor, on the state of this record, can it be said that there exists probable cause to believe that Mr. Ruiz Massieu has committed any act outside of this country which warrants his extradition, for the government has failed in four separate proceedings before two Magistrate Judges to establish probable cause.

*Massieu v. Reno*, 915 F. Supp. at 686. As the district court explained,

> The issue before the court is not whether plaintiff has the right to remain in this country beyond the period for which he was lawfully admitted; indeed, as a "non-immigrant visitor" he had only a limited right to remain here *but the right to then go on his way to wherever he wished to go*. The issue, rather, is whether an alien who is in this country legally can, merely because he is here, have his liberty restrained and be forcibly removed to a specific country in the unfettered discretion of the Secretary of State and without any meaningful opportunity to be heard. The answer is a ringing "no".

*Id.* (emphasis added).

Critical to our determination on appeal is whether the Service is relieved of its burden of proving deportability by evidence that is clear, unequivocal, and convincing. The majority adopts the position advocated by the Service that the role of the Immigration Judge and, indeed, this Board, in cases involving deportation charges brought under section 241(a)(4)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4)(C)(i) (1994), is merely "ministerial." *Matter of Ruiz-Massieu,* 22 I&N Dec. 3400 (BIA 1999). The majority insists that the letter of the Secretary of State alone is conclusive and dispositive on the issue of deportability, and that the Immigration Judge erred in requiring the Service to provide something more than the Secretary's letter to satisfy its burden of proving, according to the language of the statute, that "the Secretary of State has reasonable ground to believe [that the respondent's presence] would have potentially serious adverse policy consequences." *Id.* at 4. I

disagree.

Instead, I agree with the approach followed by the Immigration Judge. She ruled that the plain language of section 241(a)(4)(C)(i) requires that the Service prove (1) the Secretary's belief; (2) the Secretary's concern regarding the respondent's presence in this country; and (3) the "reasonable ground to believe" that the respondent's presence would have serious adverse foreign policy consequences. Therefore, I would affirm the decision of the Immigration Judge, and consequently, I dissent.


## I. ISSUE

This case presents the broad question of the allocation of authority between the Secretary of State and the Attorney General relevant to determining the ground of deportability codified at section 241(a)(4)(C)(i) of the Act. In practice, the case raises the specific issue of whether the Service shall be relieved of the burden it ordinarily bears in cases of deportability where the Secretary of State indicates that a respondent's presence or activities in the United States "would have potentially serious adverse foreign policy consequences." Section 241(a)(4)(C)(i) of the Act.


## II. FACTUAL BACKGROUND

According to the district court, whose findings are not contradicted by the record before us, the respondent is a citizen of Mexico and a member of one of Mexico's most influential and politically active families. Over the past 20 years, the respondent lived an academic life, both as a professor and director of the National University of Mexico. In addition, in recent years, he has been appointed by the Institutional Revolutionary Party ("PRI"), Mexico's only established ruling party, to several positions at the uppermost echelons of the Mexican Government, including Deputy Attorney General in 1993, Under Secretary for the Department of Government in 1994, and Deputy Attorney General, again, in May 1994. *Massieu v. Reno*, 915 F. Supp. at 687.

On September 28, 1994, within 6 months of the assassination of Luis Donaldo Colosio, the then PRI presidential candidate, the respondent's brother, Jose Francisco Ruiz-Massieu—Secretary General of the PRI and an outspoken critic of the Mexican political system —was assassinated. Within hours, the respondent, who then held the position of Deputy Attorney General, began an investigation into his brother's murder. As the district court tells it, "In the ensuing weeks, fourteen people were apprehended and indicted as part of a conspiracy uncovered through Mr. Ruiz Massieu's investigatory efforts. Many . . . named Manuel Munoz Rocha, a

PRI official, as the architect of the conspiracy." *Id.* When the respondent requested that President Carlos Salinas de Gortari waive the immunity that shielded Rocha from prosecution, his request was vigorously opposed by the PRI. By the time the immunity was waived, Mr. Munoz Rocha had disappeared and was never interviewed, apprehended, or arrested.

In a "dramatic and widely publicized speech" on November 23, 1994, the respondent announced that he was resigning from both his office and his party because of efforts by very high ranking members of the PRI—including those who might have ordered former Deputy Munoz Rocha, to act—to frustrate his investigation into his brother's murder. *Id.* In February 1995, after the respondent published a book entitled *Yo Accuso: Denuncia De Un Crimen Politico* ("I Accuse: Denunciation of a Political Crime"), which elaborated on his resignation address, Mexican authorities alleged that the respondent committed the crimes of intimidation, concealment, and "against the administration of justice" (a crime analogous to obstruction of justice in this country) in connection with the investigation of his brother's assassination. The district court noted that "[c]ontemporaneously, Mr. Ruiz Massieu claimed that he and his family began to receive both death and kidnapping threats. On March 2, 1995, he appeared for an official interrogation before Mexican authorities concerning the allegations of his criminal activity committed while in office." *Massieu v. Reno*, 915 F. Supp. at 687.

I recount the factors underlying the respondent's entry to, and attempted departure from, this country, not merely because they make a compelling story of mystery and suspense, but because they are relevant to our resolution of the appeal before us. The respondent left Mexico with his family the same day he was interrogated and threatened by the government that he believed to be covering up the assassination of his brother at the hands of one of its officials. According to the findings of the district court, on March 2, 1995, he and his family lawfully entered the United States as nonimmigrant visitors at Houston, Texas, where they have owned a home since October 1994. After remaining at their Houston home for a night, the family boarded a plane en route to Spain. When the plane touched down at Newark Airport on March 3, 1995, the respondent was arrested by United States Customs officials, pursuant to 31 U.S.C. § 5316 (1994), on a charge of reporting only approximately $18,000 of the $44,322 in his possession. This charge was never pursued and was subsequently dismissed at the Government's request. However, 2 days after his arrest in Newark, a Mexican court issued an arrest warrant for the respondent, charging him with intimidation, concealment, and "against the administration of justice." The following day, at Mexico's request, the United States presented a complaint for the respondent's provisional arrest and sought his extradition to face the charges set forth in the Mexican arrest warrant. On June 9, 1995, a Mexican court consolidated the allegations into a single charge of "against the administration of justice." *Id.*

Subsequently, four extradition hearings were conducted, none of which was successful. At the first extradition hearing in this case, the magistrate "also found that many of the statements submitted by the government were 'incredible and unreliable' [ ] and might have been altered to remove certain recantations and exculpatory statements." *Id.* at 688. Significant for our resolution of this case, "he found, and the government did not deny, that multiple statements were procured by torture inflicted by the Mexican authorities, including the inculpatory testimony of one of the government's primary affiants." *Id.*

As the district court recounts, "The government had lost its case, but not its will." *Id.* In a subsequent extradition proceeding, the Government sought and lost its request for extradition based on Mexico's newly filed charges of embezzlement. The court found that "the government had failed to demonstrate probable cause, or present any evidence whatsoever, that the funds had been illegally obtained or disbursed." *Id.* "Undeterred, on August 31, 1995, the government refiled its initial request for extradition based on the charge of 'against the administration of justice,'" which was rejected on the basis that despite nine new statements allegedly incriminating the respondent, there was no probable cause to believe that he had committed the acts alleged. *Id.*

A fourth extradition proceeding, premised on the Government's prior application relating to the previously rejected embezzlement charges, was heard and dismissed by a different district court judge. According to the district court, at this hearing, "[T]he government produced evidence which 'clearly establishe[d]' that 800,000 of the alleged 2.5 million pesos embezzled were not, in fact, proceeds of the alleged embezzlement." *Id.* "Thereafter, the United States Attorney's Office for the District of New Jersey withdrew from further representation of the Mexican government. . . . [However,] the United States Department of Justice stepped in and continued to press for . . . extradition on the embezzlement charges . . . [which was denied because] Magistrate Judge Chesler stated that 'the bottom line is that the government's efforts to establish an inference of criminality on the basis of unexplained wealth fails because it does not rise to the level where any nexus between those funds and the funds which Mr. Massieu is alleged to have embezzled has been established.'" *Id.* Indeed, "[o]n January 11, 1996, a Mexican court dismissed the embezzlement charges." *Id.*

As the district court found, "It was then, however, that this case took a turn toward the truly Kafkaesque." *Id.* at 689. On December 22, 1995, immediately after Magistrate Judge Chesler issued his opinion, the respondent was taken into custody by the Service pursuant to a previously unserved and unannounced detainer dated September 29, 1995. In addition, he was served with an Order to Show Cause and Notice of Hearing (Form I-221) by the Service. The notice advised the respondent that he was ordered to show cause as to why he should not be deported because

> [t]he Secretary of State has made a determination that, pursuant to Section 241(a)(4)(C) of the Immigration and Nationality [sic] Act, 8 U.S.C. § 1251(a)(4)(C), there is reasonable ground to believe your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

*Id.* Following the events recounted above, the Service

> produced an October 2, 1995 letter addressed to Attorney General Janet Reno from Secretary of State Warren Christopher . . . . The letter urged the Attorney General to effect Mr. Ruiz Massieu's "expeditious deportation" "to Mexico" based on the Secretary's conclusion that Mr. Ruiz Massieu's presence in the United States will have potentially serious adverse foreign policy consequences for the United States. . . . The letter referenced the "serious allegations" that are pending in Mexico against Mr. Ruiz Massieu and the recent strides that both governments have taken in "our ability to cooperate and confront criminality on both sides of the border." . . . At bottom, the Secretary's request was premised on the proposition that "[o]ur inability to return to Mexico Mr. Ruiz Massieu—a case the Mexican Presidency has told us is of the highest importance—would jeopardize our ability to work with Mexico on law enforcement matters. It might also cast a potentially chilling effect on other issues our two governments are addressing."

*Id.*

I reproduce these excerpts from the district court opinion not because they are binding on the Attorney General, and not because either the grounds or standards applicable to extradition are the same as those applicable to determinations of deportability, over which we have authority, but because they bear on two issues relevant to our determination of deportability. First, they are relevant to a determination whether the Service has met its burden of proving deportability under *Woodby v. INS*, 385 U.S. 276 (1966), and 8 C.F.R. § 242.14(a) (1997). Second, even assuming that the Service's position is correct and that the Immigration Judge and we are nothing more than highly paid clerks assigned to rubber-stamp a determination of the Secretary of State, the tale recounted above is relevant to our decision on whether the United States must afford the respondent an opportunity to seek protection under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention against Torture"), rather than deporting him to Mexico.

## III. DEPORTABILITY UNDER SECTION 241(a)(4)(C) OF THE ACT

The decision of the Immigration Judge properly refutes many of the assertions advanced by the majority, and I need not reiterate that decision in its entirety. However, it is important to state clearly that evidence of forced

presence or an inability to depart, such as exists in the respondent's case, warrants our invoking deportation proceedings only after the alien is given an opportunity to depart. *See Matter of Baldalmenti*, 19 I&N Dec. 623 (BIA 1988). Although the majority attempts to distinguish the applicable precedent cited by the Immigration Judge, certainly, citing a case does not suggest that each and every aspect of the case cited is comparable to the case in which the citation is invoked. *See Matter of Yam*, 16 I&N Dec. 535 (BIA 1978) (involving a respondent who was about to depart when arrested). It does suggest, however, that the principle for which the cited case is invoked has some bearing on the instant case.

Here, there is no question but that the respondent entered. Nevertheless, his presence here is compulsory, not voluntary. He has been seeking to depart the United States for over 4 years, since the initial 24-hour time period in which he fled Mexico and first entered the United States lawfully on a temporary visa. He has been held in custody at the behest of the United States Government despite his desire to leave the country. I find it disingenuous to contend that his presence causes the United States foreign policy concerns when the United States is compelling his presence. I also note that the letter of the Secretary of State is dated, and relates back to, 1995, 4 years ago. I note further that the Secretary of State's letter preceded the denial of four extradition proceedings in which the Government sought to return the respondent to Mexico. To the extent that his presence causes any reasonable concern today, it is the United States Government, and not any effort or desire of the respondent, that is perpetuating the basis for such concerns.

## A. Statutory Language and Congressional Intent

The ambiguities contained in section 241(a)(4)(C) of the Act cannot be disputed. The Immigration Judge and the respondent took one position regarding its interpretation and application. The Service took another position, which the majority has adopted as its own. I disagree and am filing this dissenting opinion. Certainly, the statutory language is not clear, and it does not resolve the question before us regarding the effect of the letter submitted by the Secretary of State, in relation either to the respondent's due process rights or to the statutory and regulatory requirements that govern deportation hearings.

There is a paucity of legislative history on section 241(a)(4)(C) of the Act. The Congressional Record suggests that the provision was added after both versions of the legislation had been approved by the United States Senate and House of Representatives. The Congressional Record reflects that the parameters of the 1990 amendment resulting in section 241(a)(4)(C) were neither fully debated nor clearly understood in practical terms:

Mrs. Kassebaum. Mr. President, I rise today to express concern about a provision in

the 1990 immigration legislation, giving the Secretary of State expanded authority to prohibit aliens from entering the United States. . . . I am also concerned about the procedure used to adopt this proposal. This expansion of the Secretary's discretion was not part of either the Senate or House versions of this legislation. It was not debated or discussed by either body or by the committees of jurisdiction.

136 Cong. Rec. 17,106, 17,114 (1990).[2]

Where there is doubt as to Congress' intent, deportation statutes must be construed in favor of the alien. *INS v. Errico*, 385 U.S. 214, 225 (1966); *Lennon v. INS*, 527 F.2d 187 (2d Cir. 1975). "Even if there were some doubt as to the correct construction of the statute, the doubt should be resolved in favor of the alien. . . . [E]ven where a punitive section is being construed: 'We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile.'" *INS v. Errico, supra*, at 225 (quoting *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948)). In addition, when discretionary enforcement implicates a liberty interest, courts will hesitate to "impute to Congress . . . [an intention] to give [the Secretary of State] unbridled discretion." *Kent v. Dulles*, 357 U.S. 116, 128 (1958) (finding that the Secretary of State was not authorized to deny passports to United States citizens).

In *Greene v. McElroy*, 360 U.S. 474, 504 (1959), the Supreme Court refused to infer that Congress or the President intended to authorize the Department of Defense to create a clearance program, which would have denied procedural due process to employees by permitting the Defense Department the discretion to deny or revoke security clearances without revealing the derogatory information to the employee. Without clear delegation by Congress, the Court declined to assume that Congress intended to deny due process procedures by implication. *Id.* Similarly, in the immigration context, the courts have made it clear that, although Congress has broad power to legislate, it cannot authorize the denial of due process. *See, e.g., Rafeedie v. INS*, 880 F.2d 506, 523 (D.C. Cir. 1989).

In *Doe v. Casey*, 796 F.2d 1508 (D.C. Cir. 1986) *aff'd in part, rev'd in part sub nom. Webster v. Doe*, 486 U.S. 592 (1988), the D.C. Circuit considered whether a statute that authorized the Central Intelligence Agency ("CIA") to terminate employment precluded judicial review, by providing that "the Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States." *Id.* at 1513 (citing section 102(c) of the National Security

---

[2] Senator Kassebaum was referring specifically to the provision of the Act which allows the Secretary of State to exclude aliens if the "alien's admission would compromise a compelling United States foreign policy interest." 136 Cong. Rec. at 17,114.

Act, 50 U.S.C. § 403(c) (1980)). The court held that this statute clearly did not preclude judicial review because it provided a standard for review; that is, the termination must be "necessary and advisable in the interests of the United States." *Id.* at 1512-13.

The D.C. Circuit also rebuffed the CIA's argument that the sensitive nature of its work precludes judicial review. The court stated that it must abide by what Congress intended, not by what the agency finds preferable. If Congress had intended to preclude review, it would have done so expressly. *Id.* at 1516. The court stated:

> Congress could have explicitly precluded judicial review; it did not do so. Or, Congress could have written section 102(c) narrowly to state that "the director may, in his sole discretion, terminate the employment of any officer or employee of the Agency" (omitting any reference to "necessary or advisable in the interests of the United States"); it did not so limit the language of the statute.

*Id.*

In enacting section 241(a)(4)(C) of the Act, Congress stated that, in order for an alien to be found deportable, the Secretary of State must have a *reasonable ground* to believe that the alien's presence or activities could have potentially serious adverse foreign policy consequences. There is no indication that Congress intended to give unbridled discretion to the Secretary of State to determine—without any hearing or review—that an alien is deportable. Rather, the language of the statute provides limitations on the Secretary's discretion and provides a meaningful framework in which to conduct a hearing on deportability.

## B. Due Process and Burden of Proof

The Supreme Court has held that due process guarantees cannot be abandoned lightly, stating that "[t]he requirement of 'due process' is not a fair-weather or timid assurance. It must be respected in periods of calm and in times of trouble; it protects aliens as well as citizens." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162 (1951). In *Greene v. McElroy, supra*, the Court upheld this principle in practice, stating:

> One of these [immutable principles] is that where governmental action seriously injures an individual, and the *reasonableness* of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has the opportunity to show that it is untrue.

*Id.* at 496 (emphasis added).

This constitutional protection not only attaches to criminal trials but to "all types of cases where administrative and regulatory actions were under scrutiny." *Id.* at 497. Although evidentiary rules are relaxed in deportation proceedings, the requirement of fundamental fairness is extended to an

alien in deportation proceedings, who is protected by due process under the Constitution. *Id.; see also* 8 C.F.R. § 242.14 (1997). In *Greene v. McElroy, supra*, rejecting the Navy's revocation of a security clearance, the Court held that executive agencies, although given responsibility to establish their own system for controlling the dissemination of classified information, could not fashion security programs whereby persons were deprived of their civilian employment without the opportunity to effectively challenge the adverse evidence and testimony against them. *Id.* at 497-80 (requiring an opportunity for the affected individual to confront and question persons whose statements reflected adversely on him, or to confront the government investigators who took such statements).[3]

Unproven allegations are not sufficient to find an alien deportable. The Government must always prove the basis for deportation by introducing evidence of the allegations into the record. *See, e.g., Matter of M-*, 5 I&N Dec. 484 (BIA 1953) (requiring testimony and cross-examination to establish an alien's deportability under the Act of 1918 as a "member of the Communist Party of the United States after entry").

In fact, the statute's language gives far less authority to the Secretary of State than did the statute in *Doe v. Casey, supra*, vis-a-vis the Director of the CIA. A failure to require the Government to prove that there is a reasonable ground to conclude that the respondent's presence or activities in this country would have potentially serious adverse foreign policy consequences ignores and eviscerates clear language in the deportation statute, and deprives the respondent of his due process rights to a meaningful hearing. There is no question that, under the statute, the Immigration Judge— not the Secretary of State—must make the determination of deportability. As the Supreme Court stated in *Bridges v. Wixon, supra*:

> It is the action of the deciding body, not the recommendation of the inspector, which determines whether the alien will be deported. The rules afford protection at that crucial stage of the proceedings or not at all. *The person to whom the power to deport has been entrusted is he Attorney General or such agency as he designates . . . . He is the original trier of fact.* It is his decision to deport an alien that Congress has made "final."

*Id.* at 152 (emphasis added).

Thus, in the instant case, although the Secretary of State conveys his *opinion* to this tribunal in the form of a 1995 letter stating his beliefs, the Immigration Judge below, and the Board on review, must determine based

---

[3]The Supreme Court long ago held that unsworn hearsay statements cannot be used to prove deportability and remove an individual, as "[m]eticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." *Bridges v. Wixon*, 326 U.S. 135, 152, 154 (1945) (holding that an alien was denied due process where the Service used unsworn statements to prove the alien's membership in the Communist Party)

on clear, unequivocal, and convincing evidence that the assertions of the Secretary of State—both as to the alleged presence of the respondent and as to the alleged potentially serious adverse foreign policy consequences that flow from his presence—are reasonably grounded. Just as the D.C. Circuit reasoned in *Doe v. Casey, supra*, if Congress had intended to give unbridled discretion to the Secretary of State under section 241(a)(4)(C) of the Act, it would have worded the statute differently.

This suggests that the Service must bear its ordinary burden of proving deportability under the applicable standard. The letter of the Secretary of State is what it is. It may or may not be adequate to sustain a finding of deportability. The Service is not relieved of its obligation to make out a case establishing that the respondent is deportable as charged.

In fact, when Congress has intended to give wider discretion to the executive branch in implementing provisions within the Act, it has done so specifically in the wording of the statute. *Cf.* section 243(a) of the Act, 8 U.S.C. § 1253(a) (1994). Moreover, Congress clearly was able to authorize the issuance of deportation orders without a hearing before the Immigration Judge, and without review by the Board. *See* section 238 of the Act, 8 U.S.C. § 1228 (Supp. II 1996). There is no reason to presume that in the case of deportability charged under section 241(a)(4)(C), Congress was not able to separately categorize determinations of deportability, if it wished to make the Service immune to its ordinary burden of proof. However, it did not do so. Instead, in the very same enactments that contained the amendment and recodification of section 241(a)(4)(C), but retained the provision as a matter subject to a hearing before an Immigration Judge, Congress isolated specific circumstances—such as those involving lawful residents convicted of an aggravated felony and those involving aliens previously removed —and precluded both a hearing before an Immigration Judge and review before the Board in those cases. *See* sections 236(c), 238 of the Act.

Congress did not separate out from normal deportation hearing standards or procedures those cases in which the Secretary of State had submitted a statement of reasonable grounds to believe that the respondent's presence constituted a basis for potentially serious adverse foreign policy consequences. Limiting deportation or removal hearings, as the majority suggests, abrogates all of the statutory and regulatory rights that have been extended to affected aliens by Congress. The action taken by the majority today unreasonably relieves the Service of its obligation to satisfy the burden of proving an alien deportable and compromises the rights of the affected aliens.

### C. Section 241(a)(4)(C)(ii) Exception

Finally, although the majority contends that the respondent did not seek to establish an exception to the provision under the statute, the Third Circuit found to the contrary, stating:

> Also, plaintiff argued in the district court that he came within the statutory exception contained in § 241(a)(4)(C)(ii). Under that exception, an alien who shows that he is being deported because of past statements that would be lawful within the United States shall not be deportable unless the Secretary of State personally determines that non-deportation would compromise a *compelling* United States foreign policy interest. *See* § 241(a)(4)(C)(ii), 8 U.S.C. § 1251(a)(4)(C)(ii) (incorporating 8 U.S.C. § 1182(a)(3)(C)(ii) & (iii)). Plaintiff's statutory exception argument is not frivolous, and we have no way of knowing whether the Secretary would have made the necessary statutory finding. These issues could and should have been  litigated before the immigration judge and the Board of Immigration Appeals.

*Massieu v. Reno*, 91 F.3d at 426. Significantly, the Third Circuit noted, "In light of the above, we cannot agree with the district court's statement that '[n]ot one of the purposes underlying the doctrine would be served by requiring exhaustion.' 915 F. Supp. at 697." *Id.* Thus, in finding that the respondent had not exhausted his administrative remedies, the Third Circuit appears to anticipate that the Immigration Judge and the Board would play a role that is more than ministerial. *Id.* (stating that "[t]here are certainly issues to which the immigration judge and the Board of Immigration Appeals will be able to apply their expertise, and the resolution of a number of those issues could well resolve this matter without the need for any involvement by the federal courts").

## IV. ASYLUM AND CONVENTION AGAINST TORTURE

In its opinion reversing the finding of the district court that the provision invoked against the respondent is unconstitutional, the Third Circuit noted the following:

> Plaintiff has at numerous times in this proceeding indicated an intention to seek asylum in this country. . . . While the asylum claim is within the discretion of the Attorney General, withholding of deportation *shall* be granted if the alien satisfies the relevant standards. 8 U.S.C. § 1253(h)(1). Moreover, despite plaintiff's claim that the Attorney General has predetermined the asylum issue, we have no way of determining whether the Attorney General will change her mind regarding plaintiff's deportation after plaintiff presents the evidence supporting his asylum and withholding-of-deportation claims.

*Massieu v. Reno*, 91 F.3d at 425-26 (citations omitted).

The respondent's circumstances present a situation in which a close family member was assassinated for political reasons. The respondent himself was driven out of his country as a result of explicitly political pressures and threats made against him and his family, because of the respondent's opinions and actions contrary to the government position. Even if the respondent was ineligible or opted not to apply for asylum and withholding of deportation, he would be a candidate for protection under the Convention against Torture.

## V. CONCLUSION

I cannot join an opinion that places the respondent in an impossible situation. Having entered the United States in flight from life-threatening conditions, and almost immediately seeking to leave, the respondent was apprehended and placed in custody. After such actions on the part of our government, the Service, supported by a 4-year-old letter from the Secretary of State, contends that the respondent is deportable because his presence—which we have compelled—constitutes a potentially serious adverse foreign policy consequence. Yet the basis for this supposed potentially serious foreign policy consequence has been rejected four times by two federal judges in the context of extradition proceedings. The factual allegations contained in the letter of the Secretary of State provide no information that has not been thoroughly questioned and rejected by judges of our federal courts, albeit for a slightly different purpose, extradition.

I find it pure obstinacy to insist that the Secretary of State's letter is dispositive, when Congress did not designate this ground of deportability as subject only to nonadversary or other limited proceedings, as it so readily did in other cases. There is no statutory indication that the Service was to be relieved of proving deportability in this case. It should be held to that burden, just as it is, or should be, in any other deportation case.